# EXHIBIT F

### INTERNATIONAL COURT OF ARBITRATION
### INTERNATIONAL CHAMBER OF COMMERCE

### PHILLIPS PETROLEUM COMPANY VENEZUELA LIMITED

CLAIMANT

-v-

### PETRÓLEOS DE VENEZUELA, S.A.
### AND
### CORPOGUANIPA, S.A.

RESPONDENTS

## REQUEST FOR ARBITRATION

## 10 OCTOBER 2014

THREE CROWNS

Freshfields Bruckhaus Deringer US LLP

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     THE PARTIES........................................................................................6

III.    THE ARBITRATION AGREEMENTS.................................................8

    A.  THE ARBITRATION AGREEMENT IN THE HAMACA ASSOCIATION AGREEMENT
        PROVIDES FOR ICC ARBITRATION ............................................................9

    B.  THE ARBITRATION AGREEMENT IN THE HAMACA GUARANTEE PROVIDES FOR ICC
        ARBITRATION ......................................................................................10

IV.     GOVERNING LAW, PLACE, AND LANGUAGE OF THE ARBITRATION .............13

V.      CONSTITUTION OF THE TRIBUNAL .........................................14

VI.     REQUEST TO CONSOLIDATE .......................................................14

VII.    NATURE AND CIRCUMSTANCES OF THE DISPUTE................................15

    A.  VENEZUELA MADE COMMITMENTS TO INDUCE FOREIGN INVESTMENT IN
        VENEZUELA .......................................................................................15

    B.  IN RELIANCE ON VENEZUELA'S COMMITMENTS, THE CLAIMANT INVESTED IN THE
        HAMACA PROJECT ..............................................................................18

    C.  THE RESPONDENTS HAVE WARRANTED INDEMNIFICATION IN THE EVENT OF
        DISCRIMINATORY ACTIONS UNDERTAKEN BY VENEZUELA ..............................20

    D.  THE ACTIONS AGAINST THE CLAIMANT ...................................................23

        1.  Venezuela Eviscerated the Royalty Regime Guaranteed to the Claimant
            and upon which the Claimant Relied in Investing in the Hamaca Project............24

        2.  Venezuela Significantly Increased the Tax Rate for Extra-Heavy Crude
            Oil Projects, Including the Hamaca Project..........................................24

        3.  Venezuela Completed Its Expropriation of the Claimant's Investment in
            the Hamaca Project ....................................................................25

    E.  THE RESPONDENTS WILLFULLY BREACHED THEIR OBLIGATIONS UNDER THE
        HAMACA ASSOCIATION AGREEMENT, THE HAMACA GUARANTEE, AND
        VENEZUELAN LAW ...............................................................................26

    F.  CORPOGUANIPA MUST PARTIALLY INDEMNIFY THE CLAIMANT FOR THE
        DISCRIMINATORY ACTIONS IN ACCORDANCE WITH THE HAMACA ASSOCIATION
        AGREEMENT .......................................................................................27

        1.  The Income Tax Increase Resulted in Unjust Discriminatory Treatment
            Against the Claimant.....................................................................28

        2.  The Expropriation Resulted in Unjust Discriminatory Treatment Against
            the Claimant.............................................................................28

G. PDVSA MUST PARTIALLY INDEMNIFY THE CLAIMANT FOR THE DISCRIMINATORY ACTIONS IN ACCORDANCE WITH THE HAMACA GUARANTEE................................................29

H. IN RESPONSE TO THE DISCRIMINATORY ACTIONS, CONOCOPHILLIPS REPEATEDLY COMMUNICATED ITS COMPLAINTS........................................................30

I. CONOCOPHILLIPS HAS PURSUED THE ONLY OTHER PRACTICABLE REMEDY FOR NEARLY SEVEN YEARS.................................................................31

VIII. RELIEF REQUESTED.................................................................32

## I.   INTRODUCTION

1.   This Request for Arbitration (***Request***) is submitted on behalf of Phillips Petroleum Company Venezuela Limited (***the Claimant***, ***CPH***) against Petróleos de Venezuela, S.A. (***PDVSA***) and Corpoguanipa, S.A. (***Corpoguanipa***, and together with PDVSA, the ***Respondents***) in accordance with Article 4 of the Arbitration Rules of the International Chamber of Commerce, in force as of 1 January 2012 (the ***ICC Rules***).

2.   This dispute arises from the Respondents' involvement in the unlawful confiscation of the Claimant's interest in a major oil project in Venezuela (the ***Hamaca Project***), and from the Respondents' contractual undertakings and guarantees relating to the Hamaca Project.

3.   The principal contract for the Hamaca Project, entitled the "Association Agreement" (***Hamaca Association Agreement***),[1] was signed by the Claimant and PDVSA's subsidiary, Corpoguanipa, as well as two other foreign investors:  Arco Orinoco Development Inc. (***ARCO***, a subsidiary of Atlantic Richfield Company) and Texaco Orinoco Resources Company (***Texaco***, a subsidiary of Chevron Corporation) on 9 July 1997.  On the same day, PDVSA separately issued a guaranty (the ***Hamaca Guarantee***) that was attached to the Hamaca Association Agreement.[2]

4.   The Hamaca Association Agreement created an unincorporated joint venture between the Claimant, Corpoguanipa, ARCO, and Texaco to develop extra-heavy crude oil in an area

---

[1]   **Exhibit C-1,** Association Agreement between Corpoguanipa, S.A., Arco Orinoco Development Inc., Phillips Petroleum Company Venezuela Ltd., and Texaco Orinoco Resources Company, 9 July 1997.  For clarity, **Exhibit C-1** also includes Amendment Nos. 1 through 8 to the original Hamaca Association Agreement.

[2]   **Exhibit C-2,** Guarantee Agreement between Petróleos de Venezuela, S.A., Arco Orinoco Development Inc., Phillips Petroleum Company Venezuela Ltd., and Texaco Orinoco Resources Company, 9 July 1997 (with Amendments) (referred to hereinafter as the "Hamaca Guarantee" (Hamaca Association Agreement, Exhibit M)).

of the Hamaca region of Venezuela's Orinoco Oil Belt.[3]  The collaboration was known as the Hamaca Association (the *Hamaca Association*).

5.     Under the Hamaca Association Agreement, Corpoguanipa must partially indemnify the Claimant for specified "Discriminatory Actions" by the Bolivarian Republic of Venezuela (*Venezuela*) in accordance with the compensation formula set forth in the Hamaca Association Agreement.

6.     In the Hamaca Guarantee, PDVSA has unconditionally guaranteed Corpoguanipa's performance of the Hamaca Association Agreement, including the obligation to indemnify the Claimant should a Discriminatory Action occur.[4]

7.     The Hamaca Association Agreement and the Hamaca Guarantee were executed as part of the *Apertura Petrolera* (the *Oil Sector Opening*), a broader initiative by the Venezuelan government in the early 1990s to encourage private investment in the oil industry.  Based in part on the contractual obligations of PDVSA and Corpoguanipa, the Claimant made substantial financial and capital investments in the Hamaca Project, which achieved its first commercial shipment in October 2004.[5]

8.     The Claimant held its interests in the Hamaca Project until 26 June 2007, when Venezuela confiscated the Hamaca Project with the Respondents' collaboration and assistance.  This confiscation of the Claimant's entire interest in the Hamaca Project[6] was

---

[3]     **Exhibit C-1,** Hamaca Association Agreement.

[4]     **Exhibit C-2**, Hamaca Guarantee (Hamaca Association Agreement, Exhibit M)).

[5]     **Exhibit C-32**, Phillips Petroleum Company Venezuela Limited Report of Independent Auditors and Consolidated Financial Statements, as of 31 December 2006 and 2005, 6 March 2007, at 9.

[6]     This confiscation followed a seizure of the Hamaca Project on May Day, *i.e.*, 1 May 2007; *see infra* ¶69.  On 11 September 2007, the Venezuelan National Assembly formalized the confiscation by enacting the Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements (the *Law on Effects*) signed by President Chávez on 5 October 2007.  **Exhibit C-39**, *Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements*, OFFICIAL GAZETTE No. 38,785, published 8 October 2007.  *See also* **Exhibit C-31**, *Decree With Rank, Value and Force of Law of Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Risk and Profit Sharing Exploration Agreements, Decree No. 5,200*, OFFICIAL GAZETTE No. 38,632, published 26 February 2007.

2

the last in a series of interconnected governmental actions targeting the Claimant and other foreign oil companies operating in Venezuela.  On 29 July 2007, then President Hugo Chávez described the process culminating in the expropriation of the Hamaca Project (along with others) as the "dismantling" and "bur[ial]" of the *Apertura Petrolera*, which he dubbed "the neoliberal, colonialist giveaway Project."[7]  Each of the events at issue in this case was detailed by President Chávez in his description of the five "steps" comprising the expropriation (the ***Discriminatory Campaign***):[8]

(a)     *First*, starting in October 2004:  Venezuela (i) unilaterally abrogated a Royalty Agreement that had been executed in respect of the Claimant's investment and imposed instead a 16⅔ percent royalty rate (the ***Royalty Agreement Abrogation***); and, in May 2006, (ii) proceeded to introduce a new oil tax (the ***Extraction Tax***), which effectively raised the royalty rate to 33⅓ percent.  President Chávez described the Royalty Agreement Abrogation and the Extraction Tax as "step one" and "step three," respectively, of the Discriminatory Campaign.[9]

(b)     *Second*, on 29 August 2006:  Venezuela eliminated the income tax regime that it had enacted to induce investment in the extra-heavy crude oil projects, raising the applicable income tax rate from 34 percent to 50 percent (the ***Income Tax Increase***).  President Chávez described the Income Tax Increase as "step four" of the Discriminatory Campaign.

(c)     *Third*, beginning in February 2007:  Venezuela (i) having already appropriated to itself a substantial amount of the value of Claimant's interest in the Hamaca Project; (ii) issued a nationalization decree-law (the ***Nationalization Decree***) mandating that PDVSA take over all foreign majority-owned oil projects in Venezuela, including the Hamaca Project; (iii) caused Corpoguanipa, with troops

---

[7]     **Exhibit C-38**, Transcript of Aló Presidente Nº 288:  Desde la Faja Petrolífera del Orinoco, Hugo Chávez Frías, President of the Bolivarian Republic of Venezuela, 29 July 2007, at 3, 6, 7 (transcript available from Servicio TvPrensa).

[8]     *Id*. at 7-11.

[9]     *Id*. at 8, 10.  According to President Chávez, "step two" was the increase of the royalty rate to 30% for certain projects outside of the Orinoco Oil Belt.  *See id*. at 8-9.

standing by, to assume control over operations at the Hamaca Project on 1 May 2007; and (iv) publicly announced that it had expropriated the Claimant's interests in the Project (together the ***Expropriation***).  The Nationalization Decree was described by President Chávez as "step five."

9.     The confiscation of the Hamaca Project was formally ratified by the Venezuelan National Assembly pursuant to the Law on Effects, which was published on 8 October 2007.[10]

10.    The Respondents had a direct and instrumental role in these "steps," through which they secured for themselves the value of the Claimant's interest in the Hamaca Project.  They actively worked to effect a series of measures to destroy the Hamaca Association Agreement that they had undertaken and guaranteed would be fully performed.

11.    The Respondents' conduct constitutes willful breach of contract (or, alternatively, *hecho ilícito* (tortious interference) under Venezuelan law), and requires that the Respondents make the Claimant whole for the entirety of the damages it has suffered as a result.

12.    At a minimum, the Respondents are obligated to partially indemnify the Claimant pursuant to the Hamaca Association Agreement and Hamaca Guarantee for the Discriminatory Actions to be identified and explained below.

13.    In response to the Discriminatory Campaign, the Claimant, along with its corporate parent ConocoPhillips Company (***ConocoPhillips***), repeatedly communicated its complaints to Corpoguanipa.  ConocoPhillips further pursued the only other practical remedy for nearly seven years.  Promptly following the Expropriation, ConocoPhillips, and three of its Dutch subsidiaries – ConocoPhillips Hamaca B.V. (***CPH  BV***), ConocoPhillips Petrozuata B.V. (***CPZ***), and ConocoPhillips Gulf of Paria B.V. (***CPG***) (collectively, the ***ICSID Claimants***) – commenced arbitration against Venezuela before the International Centre for Settlement of Investment Disputes (the ***ICSID  Arbitration***) pursuant to the Netherlands-Venezuela Bilateral Investment Treaty (the ***BIT***).  The

---

[10]    **Exhibit  C-39**, *Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements*, OFFICIAL GAZETTE No. 38,785, published 8 October 2007.

respondent in the ICSID Arbitration, Venezuela, is not a signatory to the Hamaca Association Agreement or the Hamaca Guarantee, nor is it a named party to these ICC proceedings.   Venezuela is the sole respondent in the ICSID Arbitration and its obligations arise in that action under a separate legal instrument, the BIT.

14.   On 3 September 2013, the tribunal in the ICSID Arbitration (the ***ICSID Tribunal***) rendered a Decision on Jurisdiction and the Merits (the ***Decision on Jurisdiction and Liability***), in which it held that Venezuela had violated the BIT by illegally expropriating the ICSID Claimants' investments in the Hamaca Project, as well as their investments in two additional projects.[11]   On 8 September 2013, Venezuela sought to have the ICSID Tribunal reconsider its decision; its motion was denied by a reasoned decision on 10 March 2014.

15.   Although the ICSID Tribunal found in favor of the ICSID Claimants' expropriation claims, it held that the claims arising from the Royalty Agreement Abrogation, the Extraction Tax, and the Income Tax Increase were outside the scope of the BIT.[12]   The ICSID Tribunal, however, did not question the ICSID Claimants' substantive entitlements with regard to those claims through alternative remedies.   As a result of that ruling, these ICC proceedings are the only other practicable legal recourse for the Claimant's injuries flowing from the Royalty Agreement Abrogation, the Extraction Tax, and the Income Tax Increase.   These claims are presented now alongside all other claims flowing from the Respondents' adverse conduct.   At this time, the ICSID Arbitration remains ongoing, in order to determine the quantum of compensation that Venezuela must pay under international law for its illegal expropriation in breach of the BIT.

16.   The Claimant now brings these separate ICC proceedings seeking redress against the Respondents under the Hamaca Association Agreement and applicable Venezuelan law.

---

[11]   **Exhibit C-40**, *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on Jurisdiction and the Merits, 3 September 2013 (referred to hereinafter as the "Decision on Jurisdiction and Liability") ¶¶361–402.

[12]   *Id.* ¶¶318–32.   The ICSID Tribunal also determined that it had no jurisdiction over claims advanced under Article 22 of Venezuela's Investment Law.

## II.    THE PARTIES

17.    The Claimant is a company incorporated under the laws of Bermuda with its registered
offices at:

> c/o ConocoPhillips Company
> 600 North Dairy Ashford
> Houston, Texas 77079
> United States of America
>
> Tel:  +1 281 293 1000
> Fax:   +1 832 486 2027

18.    The Claimant is presently wholly-owned by CPH BV, which was incorporated in July
2006 as a part of ConocoPhillips' decision to restructure its Venezuelan investments
through Dutch subsidiaries.[13]

19.    ConocoPhillips and Chevron Corporation jointly owned their interests in the Hamaca
Association through Hamaca Holdings LLC, a Delaware limited liability company.  CPH
BV held 57.1429 percent of the membership interest in Hamaca Holding LLC, which
equated to a 40 percent interest in the Hamaca Association, which was held by the
Claimant.[14]

---

[13]   On 17 July 2006, CPH BV was incorporated with Phillips Petroleum International Investment Company as its
sole shareholder.   **Exhibit  C-24.**  ConocoPhillips Hamaca B.V. Deed of Incorporation and Articles of
Association, 17 July 2006.  On 22 September 2006, Phillips Petroleum International Investment Company
transferred to CPH BV its ownership interest in Hamaca Holding LLC (a Delaware limited liability company,
which indirectly held the 40 percent interest of ConocoPhillips in the Hamaca Association).   **Exhibit C-26.**
Shareholder's Resolution of Phillips Petroleum International Investment Company, 22 September 2006.

[14]   A copy of the Deed of Incorporation and Articles of Association of CPH BV is attached at **Exhibit C-24.**
Evidence of CPH BV's ownership interest in the Hamaca Project is attached at **Exhibit C-26.**

20.     The Claimant is represented in this arbitration by Three Crowns LLP and Freshfields Bruckhaus Deringer US LLP.  All correspondence and notices to the Claimant relating to this arbitration should be addressed to:

> Constantine Partasides QC
> Three Crowns LLP
> 1 King Street
> London EC2V 8AU
> United Kingdom
>
> Tel:   +44 20 3530 7950
> Email:  constantine.partasides@threecrownsllp.com
>
> Jan Paulsson
> Three Crowns LLP
> 601 13th Street NW, Suite 360
> Washington, DC 20005
> United States of America
>
> Tel:  +1 202 540 9470
> Email:  jan.paulsson@threecrownsllp.com
>
> Luke Sobota
> Three Crowns LLP
> 601 13th Street NW, Suite 360
> Washington, DC 20005
> United States of America
>
> Tel:   +1 202 540 9477
> Email:  luke.sobota@threecrownsllp.com
>
> D. Brian King
> Freshfields Bruckhaus Deringer US LLP
> 601 Lexington Avenue, 31st Floor
> New York, NY 10022
> United States of America
>
> Tel:   +1 212 277 4020
> Email:  brian.king@freshfields.com
>
> Elliot Friedman
> Freshfields Bruckhaus Deringer US LLP
> 601 Lexington Avenue, 31st Floor
> New York, NY 10022
> United States of America

Tel:  +1 212 230 4666
Email:  elliot.friedman@freshfields.com

21. Respondent PDVSA is the national oil company of Venezuela.  It is a corporation organized and existing under the laws of Venezuela.  Venezuela is the sole shareholder of PDVSA.  PDVSA's present registered address is:

> Petróleos de Venezuela, S.A.
> Avenida Libertador
> Edificio Petróleos de Venezuela
> Urb. La Campiña
> Caracas
> Venezuela

22. Respondent Corpoguanipa is a corporation organized under the laws of Venezuela. Corpoguanipa is presently a wholly-owned subsidiary of PDVSA Petróleo S.A. (**PDVSA Petróleo**), which in turn is a wholly-owned subsidiary of PDVSA.  At the time that Corpoguanipa executed the Hamaca Association Agreement, it was a wholly-owned subsidiary of Corpoven, S.A. (**Corpoven**), which itself was a wholly-owned subsidiary of PDVSA.[15]  Corpoguanipa's present registered address is:

> Corpoguanipa, S.A.
> Avenida Libertador
> Edificio Petróleos de Venezuela
> Urb. La Campiña
> Caracas
> Venezuela

## III.    THE ARBITRATION AGREEMENTS

23. In accordance with Section 17.2 of the Hamaca Association Agreement and Section 13 of the Hamaca Guarantee, the dispute submitted in this Request is subject to arbitration in accordance with the ICC Rules.

---

[15]   In the Hamaca Association Agreement, Corpoguanipa is defined as the "Corpoven Sub" and in the Hamaca Guarantee it is defined as the "Corpoven Affiliate."

### A. THE ARBITRATION AGREEMENT IN THE HAMACA ASSOCIATION AGREEMENT PROVIDES FOR ICC ARBITRATION

24.     Section 17.2 of the Hamaca Association Agreement provides that "[a]ny disputes arising out of, or relating in any way to this Agreement" shall be finally settled through ICC arbitration before a three-member arbitral tribunal:

> Any dispute arising out of, or relating in any way to this Agreement shall be settled exclusively and finally by arbitration.  The arbitration shall be conducted and finally settled with the ICC Rules.
>
> (i)    If there are only two (2) parties to a dispute, then each party shall appoint one arbitrator within thirty (30) days of receipt of notice of the commencement of the arbitration, and the two (2) arbitrators so appointed shall appoint the third (3rd), and presiding, arbitrator within thirty (30) days after the latter of the two (2) arbitrators is appointed by the parties.  If the two (2) arbitrators so appointed cannot agree within thirty (30) days of their appointment on a third (3rd) arbitrator to serve as presiding arbitrator and such time is not extended, then the presiding arbitrator shall be appointed by the ICA as quickly as practicable.
>
> (ii)   If there are more than two (2) parties to a dispute, such parties shall attempt to agree, within fifteen (15) days after delivery of notice of the commencement of the arbitration to all of them, to divide themselves into two (2) groups for purposes of appointing arbitrators.  If they so agree within such fifteen (15) day period, then each group shall within a further thirty (30) days appoint one (1) arbitrator, and the two (2) arbitrators so appointed shall appoint the third (3rd), and presiding, arbitrator within thirty (30) days after the later of the two (2) arbitrators is appointed by the two (2) groups.  If the two (2) arbitrators so appointed cannot agree within such thirty (30) day period on a third (3rd) arbitrator to serve as presiding arbitrator and such time is not extended, then the presiding arbitrator shall be appointed by the ICA as quickly as practicable.
>
> (iii)  If there are more than two (2) parties to a dispute and they cannot agree within the above-mentioned fifteen (15) day period as to how they should be grouped for purposes of appointing arbitrators, then the ICA shall attempt, as quickly as practicable, to group the parties into two (2)

groups based on the parties' common interests and common positions.  If the ICA determines such grouping, each group so determined shall attempt to appoint one (1) arbitrator within thirty (30) days after such determination.  The two (2) arbitrators so appointed shall appoint the third (3rd), and presiding arbitrator, within thirty (30) days after their appointment.  If their group fails to appoint an arbitrator within such thirty (30) day period, such arbitrator shall be appointed by the ICA as quickly as practicable.  If the two (2) arbitrators so appointed cannot agree within thirty (30) days after the later of the two (2) arbitrators is appointed by or for the parties, on a third (3rd) arbitrator to serve as presiding arbitrator and such time is not extended, then the presiding arbitrator shall be appointed by the ICA as quickly as practicable.  In the event the ICA determines that it cannot in fairness group the parties into two (2) groups based upon common interests and positions, all three (3) arbitrators shall be appointed by the ICA as quickly as practicable. [16]

25. Any award rendered by such arbitral tribunal is to contain reasons and shall be final and binding upon the parties.[17]

## B. The Arbitration Agreement in the Hamaca Guarantee Provides for ICC Arbitration

26. Section 13 of the Hamaca Guarantee is materially identical to Section 17.2 of the Hamaca Association Agreement and provides:

Any disputes resulting from or relating to this Guarantee or its performance will be resolved exclusively by arbitration and any arbitration ruling will be binding.  The arbitration will be governed and conducted in accordance with the Mediation and Arbitration Rules of the International Arbitration Court (hereinafter referred to as the "ICA") of the International Chamber of Commerce (hereinafter referred to as the "ICC Rules").  The Guarantor will appoint one (1) arbitrator and the Foreign Parties (or if more than one Foreign Party is involved in the dispute, collectively, the Foreign Parties) will appoint one (1) arbitrator, and if the Guarantor or the Foreign Party (or the Foreign Parties collectively) fail to appoint their arbitrators within a period of thirty (30) days following receipt of the

---

[16]  **Exhibit C-1**, Hamaca Association Agreement § 17.2(a).

[17]  *Id.* § 17.2(e).

notice of the initiation of the arbitration process, the ICA will appoint an arbitrator to represent the party in question.  The two (2) arbitrators thus appointed, either by the parties or in representation of the parties, will appoint the third arbitrator, who will preside over the arbitration court, with a period of thirty (30) days following the date on which the last of the two arbitrators is appointed by or in representation of the Guarantor and the Foreign Party (or the Foreign Parties collectively).  If the two (2) arbitrators thus appointed are unable to reach an agreement regarding the appointment of the third arbitrator to preside over the arbitration court within a period of thirty (30) days following the date on which the last of the two arbitrators is appointed by or in representation of the Guarantor or the Foreign Party (or the Foreign Parties collectively), and if the deadline is not extended, then the arbitrator who will preside of the arbitration court will be appointed by the ICA as soon as possible.[18]

27. Any award rendered by such arbitral tribunal is to contain reasons and shall be final and binding upon the parties.[19]

28. Article 9 of the ICC Rules permits claims arising out of or in connection with more than one contract to be brought in a single arbitration.  Article 9 refers to Articles 6(3)-6(7) and 23(4), which in pertinent part refer in turn to a *prima facie* showing of compatibility between the applicable arbitration agreements and express or implied agreement by the parties that the claims can be determined together in a single arbitration.

29. The requirements of Article 9 are satisfied here.  Both the Hamaca Association Agreement and the Hamaca Guarantee contain arbitration agreements that provide for a three-member Arbitral Tribunal.[20]  Both provide for ICC Arbitration to be seated in New York.  And both extend to "any disputes arising out of"[21] or "resulting from or related to"[22] the underlying agreement.

---

[18] **Exhibit C-2**, Hamaca Guarantee (Hamaca Association Agreement, Exhibit M) § 13.

[19] *Id.*

[20] **Exhibit C-1**, Hamaca Association Agreement § 17.2(a); **Exhibit C-2**, Hamaca Guarantee (Hamaca Association Agreement, Exhibit M) § 13.

[21] **Exhibit C-1,** Hamaca Association Agreement § 17.2(a).

[22] **Exhibit C-2**, Hamaca Guarantee (Hamaca Association Agreement, Exhibit M) § 13.

30.     Moreover, in the Hamaca Guarantee, PDVSA explicitly consented to the consolidation of an arbitration arising from that agreement with one arising from the Hamaca Association Agreement, or other related agreement, if the disputes concern common issues:

> Without limiting or restricting the above provisions, the Guarantor hereby agrees that, at the request of any Foreign Party, it will be joined as a party to any arbitration process initiated under the terms of the [Association] Agreement or any Related Agreement related to compliance by [Corpoguanipa] with its obligations under the terms of the Agreement or any Related Agreement.  The Guarantor and each of the Foreign Parties agree that any arbitration process initiated under the terms and conditions of this Guarantee, may be joined to any arbitration process initiated under the terms of the Agreement or any Related Agreement, if the subject matter of the processes is related due to common legal or factual issues which could result in contradictory rulings or obligations.[23]

31.     Further, the Hamaca Guarantee provides for mutual compatibility of its appointment mechanism and that of the Hamaca Association Agreement:

> The Guarantor agrees that, for purposes of appointment of arbitrators and grouping of the parties for the corresponding appointments, the interests and positions of the Guarantor will be understood to be identical to those of [Corpoguanipa] (including any Affiliate considered to be a Corpoven Affiliate pursuant to the provisions of Section 8 of its Guarantee) and Corpoven S.A., a business corporation incorporated in accordance with the laws of the Republic of Venezuela . . . with the understanding that, if the interests and positions of [Corpoguanipa] and Corpoven are not identical, the ICA will appoint all of the arbitrators in the arbitration process.[24]

32.     The appointment mechanisms set out in both agreements are mutually compatible.  To summarize, under the relevant provisions of the arbitration agreements and Article 12 of the ICC Rules, the procedure for appointing the Arbitral Tribunal is as follows:

(a)     As set out in paragraph 37 below, with this Request the Claimant nominates Dr. Poncet as arbitrator.

---

[23]  *Id.* § 13.

[24]  *Id.*

(b) Within 30 days of the Respondents' receipt of this Request from the Secretariat of the ICC International Court of Arbitration (the **_ICC Court_**), the Respondents are required to submit an Answer including their joint nomination of an arbitrator.

(c) Within 30 days from confirmation of the parties' nominations by the Secretariat of the ICC Court, the two arbitrators so appointed should then endeavor to appoint the third arbitrator to serve as president of the Arbitral Tribunal.

(d) If the two arbitrators fail to appoint the presiding arbitrator within 30 days of their confirmation, any party may request in writing that the ICC Court appoint the third arbitrator.

33. The compatibility of the two arbitration clauses and the cognate relationship between the Hamaca Association Agreement and the Hamaca Guarantee indicate a common understanding that related claims arising under both should be decided together in a single arbitration.

## IV. GOVERNING LAW, PLACE, AND LANGUAGE OF THE ARBITRATION

34. The Hamaca Association Agreement and the Hamaca Guarantee both provide that they are governed by the laws of Venezuela.[25]

35. The Hamaca Association Agreement and the Hamaca Guarantee both provide that New York is the place of arbitration.[26]

36. The Hamaca Association Agreement and the Hamaca Guarantee both provide that the language of these proceedings should be English.[27]

---

[25] **Exhibit C-1,** Hamaca Association Agreement § 17.1; **Exhibit C-2**, Hamaca Guarantee (Hamaca Association Agreement, Exhibit M) § 10.

[26] **Exhibit C-1,** Hamaca Association Agreement § 17.2(c); **Exhibit C-2**, Hamaca Guarantee (Hamaca Association Agreement, Exhibit M) § 13.

[27] **Exhibit C-1,** Hamaca Association Agreement § 17.2(c); **Exhibit C-2**, Hamaca Guarantee (Hamaca Association Agreement, Exhibit M) § 13.

## V.    CONSTITUTION OF THE TRIBUNAL

37.    In accordance with the arbitration agreements and Article 12(6) of the ICC Rules, the Claimant nominates Dr. Charles Poncet as arbitrator.  Dr. Poncet's contact details are:

> Dr. Charles Poncet M.C.L.
> CMS von Erlach Poncet Ltd.
> Rue Bovy-Lysberg 2
> P.O. Box 5824
> 1211 Geneva 11, Switzerland
>
> Tel:   +41 22 311 00 10
> Fax:   +41 22 311 00 20
> Email:   charles.poncet@cms-vep.com

To the best of the Claimant's knowledge, Dr. Poncet is impartial and independent of the parties to this arbitration.

## VI.    REQUEST TO CONSOLIDATE

38.    Article 10 of the ICC Rules provides that the ICC Court may consolidate two or more ICC arbitrations into a single arbitration "at the request of a party."

39.    The Claimant respectfully requests that the ICC Court consolidate this arbitration with a second ICC arbitration launched simultaneously today by CPZ against PDVSA and its subsidiary PDVSA Petróleo.  The claims by CPZ (another wholly-owned subsidiary of ConocoPhillips) arise out of an Association Agreement for another ConocoPhillips investment in Venezuela, the Petrozuata Project (the *Petrozuata Association Agreement*) and its accompanying guaranty (the *Petrozuata Guaranty*) and are substantially similar to claims advanced by the Claimant in the present arbitration.  Both the Hamaca and Petrozuata Projects were expropriated simultaneously at the conclusion of the same interconnected "steps" set out by President Chávez.

40.    The Hamaca and Petrozuata ICC proceedings also feature substantially similar requests for relief and the same Claimant-appointed arbitrator, Dr. Poncet.  Moreover, both of the ICC proceedings arise out of arbitration clauses that, though varying in their level of detail, would be mutually compatible in a consolidated arbitration.

14

## VII.   NATURE AND CIRCUMSTANCES OF THE DISPUTE

### A.   VENEZUELA MADE COMMITMENTS TO INDUCE FOREIGN INVESTMENT IN VENEZUELA

41.   The Orinoco Oil Belt – a region north of the Orinoco River in eastern Venezuela – contains vast amounts of extra-heavy crude oil.  In the early 1990s, Venezuela sought to increase its crude oil production to more than four million barrels per day.  The *Apertura Petrolera* was announced to achieve that goal through a policy of, among other measures, incentivizing private investment in the oil industry and developing Venezuela's extra-heavy crude oil resources.

42.   Venezuela placed particular importance on the need for foreign investment in connection with the development of extra-heavy crude oil projects in the Orinoco Oil Belt because: (*a*) the Orinoco Oil Belt has some of the largest oil reserves in the world; (*b*) extra-heavy crude oil is technically difficult to extract and commercialize; and (*c*) the commercialization of extra-heavy crude oil requires advanced technology and significant investments, including the construction of upgraders designed to convert this tar-like substance into a new, synthetic upgraded crude oil product (*syncrude*) and, in some cases, the modification of downstream refineries to refine syncrude into saleable end products.

43.   The Venezuelan Congress formed a Bicameral Commission[28] to define the structure and fiscal incentives for all foreign investment in the Orinoco Oil Belt.  In 1993, the Bicameral Commission issued a report outlining the structure that it had determined would be needed to attract foreign investment to the Orinoco Oil Belt (the *Petrozuata Bicameral Report*).[29]

---

[28]   The full title of the Bicameral Commission was the "Bicameral Commission for the Study of the Strategic Associations of PDVSA concerning the Projects Maraven-Conoco and Maraven-Total-Itochu-Marubeni for the Exploitation and Upgrading of Extra-Heavy Petroleum of the Orinoco Oil Belt" (the *Bicameral Commission*).

[29]   **Exhibit C-3**, Report Approved by the Bicameral Commission for the Study of the Strategic Associations of PDVSA concerning the Projects Maraven-Conoco and Maraven-Total-Itochu-Marubeni for the Exploitation and Upgrading of Extra-Heavy Petroleum of the Orinoco Oil Belt, 12 August 1993.

44.     The Petrozuata Bicameral Report set forth three fundamental legal elements necessary to induce foreign private investment for the development of the Orinoco Oil Belt and the associated financing:  (*a*) lower taxes, and in particular exempting the Orinoco Oil Belt associations from the 67.7 percent income tax rate then applicable to PDVSA and instead applying the much lower corporate income tax rate; (*b*) lower royalty rates for the first several years of the associations' operations; and (*c*) foreign majority ownership of the associations.[30]

45.     Over the next years, the Venezuelan Congress implemented the recommendations of the Bicameral Commission, including revisions to the income tax law to assure foreign investors that the associations in the Orinoco Oil Belt would be subject to only the 34 percent corporate income tax regime applicable generally to any other industry and commercial activity in Venezuela.[31]  That decision was implemented by both legislation and executive decree-law.[32]

46.     Beginning in October 1994, PDVSA, as the State company in the Hamaca Association, negotiated an agreement with the Venezuelan Ministry of Energy and Mines concerning the royalties applicable to the extra-heavy crude oil projects, including the Hamaca Project.  This agreement (the ***Royalty Agreement***) provided that each association would pay the Government a reduced royalty of one percent from commencement of commercial production until the earlier of:  (*a*) nine years from such commencement or (*b*) the time when the project had accrued sales income in excess of three times the total

---

[30]     *Id.*

[31]     **Exhibit C-5**, *Decree-Law No. 3,113, Issuing the Law Partially Amending the Income Tax Law*, OFFICIAL GAZETTE No. 4,628, published 9 September 1993 ("The companies that are constituted under association agreements . . . shall be taxed under the ordinary regimen established in this Law for the anonymous corporations and the taxpayers."); *see also* **Exhibit C-6**, *Decree-Law No. 188, Decree-Law Reforming the Income Tax Law,* OFFICIAL GAZETTE No. 4,727, published 27 May 1994 (setting the applicable income tax rate at 34%).

[32]     *See* **Exhibit C-5**, *Decree-Law No. 3,113, Issuing the Law Partially Amending the Income Tax Law*, OFFICIAL GAZETTE No. 4,628, published 9 September 1993; *see also* **Exhibit C-6**, *Decree-Law No. 188, Decree-Law Reforming the Income Tax Law,* OFFICIAL GAZETTE No. 4,727, published 27 May 1994; **Exhibit C-4**, *Law Authorizing the President of the Republic to Adopt Extraordinary Measures in Economic and Financial Matters*, OFFICIAL GAZETTE No. 35,280, published 23 August 1993, at art. 3.

investment made in development of the project.  Upon expiration of the one percent royalty period, royalties were to be paid at the rate of 16⅔ percent.[33]

47.  Corpoven assured ConocoPhillips that the Ministry would make the Nine-Year Royalty Reduction available to the Hamaca Project, and this assurance was confirmed by the Bicameral Commission for the Hamaca Project on 8 April 1997 when it approved conditions relevant to the Hamaca Project (the ***Hamaca Conditions***) and presented them to the full Venezuelan Congress for its final approval.[34]

48.  On 24 April 1997, the Venezuelan Congress approved the Hamaca Conditions for the strategic association.[35]  Significantly, two of the Hamaca Conditions dealt with the income tax rate and the royalty rate.  In material part, they provided as follows:

> **Fifteen:** . . . [U]nder the provisions of the single paragraph of Article 9 of the Income Tax Law currently in effect, the Parties and each of the Entities shall pay tax under the ordinary regime established in such law for companies and entities consolidated into them [*ie*, the normal corporate rate of 34 percent], for any income realized in connection with the activities of the Association.
>
> **Sixteen:** The National Executive Branch may agree on a mechanism for adjusting the imposition of the exploitation tax [royalty] established in Article 41 of the [1943] Hydrocarbons Law to the Parties.[36]

---

[33]  The Ministry of Energy and Mines first agreed in principle to the one percent rate in a letter to PDVSA Petróleo, dated 3 October 1994 in relation to the Petrozuata Project (**Exhibit C-7**), which was forwarded to Conoco several days later.  (The name of the Ministry of Energy and Mines was changed in 2005 to the Ministry of Energy and Petroleum and again, in 2007, to the People's Ministry of Energy and Petroleum.  For ease of reference, all references in this Request are to the "Ministry.")  Currently, its name is the People's Ministry of Petroleum and Mining.  The Ministry and PDVSA Petróleo (at the time, PDVSA Petróleo y Gas, S.A.) entered into the Royalty Agreement on 29 May 1998 (**Exhibit C-14**).  The Claimant then entered into an adhesion agreement to the Royalty Agreement for the Hamaca Project on 29 October 1998 (**Exhibit C-15**).

[34]  **Exhibit C-8**, Facsimile from Daniel García to Ray Manning *et al.*, 23 April 1997.

[35]  **Exhibit C-11**, *Agreement Approving the Framework of Conditions of the Association Agreement for the Production, Transportation and Upgrading of Extra-Heavy Crude to be Produced in the Hamaca Area of the Orinoco Oil Belt, as well as the Marketing of the Upgraded Crude and Other Products Generated During the Process of Production and Upgrading of Such Crudes, to be Entered into between Corpoven, S.A., a Subsidiary of Petróleos de Venezuela, and the Companies Atlantic Richfield Co. (ARCO), Phillips Petroleum Company and Texaco, Inc.*, OFFICIAL GAZETTE No. 36,209, published 20 May 1997.

[36]  *Id.*

49.     In relation to the sixteenth of the Hamaca Conditions, ConocoPhillips proceeded to make clear to Corpoven that the Nine-Year Royalty Reduction was a condition precedent to its investment and ConocoPhillips would not proceed with the Hamaca Project absent the expected royalty rate.[37]

50.     On 7 May 1997, the Hamaca Bicameral Commission unanimously approved the draft of the Hamaca Association Agreement that had been negotiated between the parties.[38] Based on the recommendations of the Bicameral Commission for the Hamaca Project, on 11 June 1997, the Venezuelan Congress approved the Project[39] involving the Claimant and Corpoguanipa.

**B.      IN RELIANCE ON VENEZUELA'S COMMITMENTS, THE CLAIMANT INVESTED IN THE HAMACA PROJECT**

51.     On 9 July 1997, the Claimant, Corpoguanipa, ARCO, and Texaco entered into the Hamaca Association Agreement,[40] which established the corporate structure for the Project.

52.     The Project was structured as an unincorporated joint venture, the Hamaca Association.[41] Two entities were formed to operate the Project.  A management company, Petrolera Hamaca, S.A. (***Petrolera Hamaca***), was responsible for the overall direction and supervision of the Project, with a management board appointed by each participant

---

[37]   **Exhibit C-9**, E-mail from Laurie Gibson to Ray Manning *et al.*, 30 April 1997.

[38]   **Exhibit C-10**, *Bicameral Commission Approved Contract for the Hamaca Project*, POLÍTICA, 8 May1997.

[39]   *See* **Exhibit C-13**, *Agreement of the Congress of the Venezuelan Republic Authorizing the Execution of an Association Agreement and its Annexes for the Exploration, Development, Production, Blending, Processing, Transportation, Refining and Upgrading, as well as the Marketing of Crude Oil and Other Products to be Generated During the Process of the Production and Upgrading of Such Extra-Heavy Crudes in the Area Determined by the Ministry of Energy and Mines, Among the Subsidiaries of Corpoven, S.A., a Subsidiary of Petroleos de Venezuela, S.A., Atlantic Richfield Company, Phillips Petroleum Company and Texaco Inc., on the Terms and Conditions that Have Been Presented by the National Executive Branch*, OFFICIAL GAZETTE, No. 36,235, published 26 June 1997.

[40]   **Exhibit C-1**, Hamaca Association Agreement.

[41]   *Id.*

according to its ownership interest.[42]  Day-to-day operations were carried out by a second entity, Petrolera Ameriven, S.A., which was owned by the Project participants and staffed, in part, by seconded employees from ConocoPhillips, Texaco, and PDVSA.[43]

53.     Shares of Petrolera Hamaca were divided into four classes.  Thirty percent of the Hamaca Association was owned by Corpoguanipa in the form of "Class A" shares.  ARCO owned 30 percent of the Hamaca Association in the form of "Class B" shares.  The Claimant owned 20 percent of the Hamaca Association in the form of "Class C" shares.  Finally, Texaco owned 20 percent of the Hamaca Association in the form of "Class D" shares.

54.     On the same date as the signature of the Hamaca Association Agreement, PDVSA executed the Hamaca Guarantee (Exhibit M to the Hamaca Association Agreement) in favor of the Claimant, ARCO, and Texaco.  The Hamaca Guarantee promised observance and performance of all of the obligations assumed by Corpoguanipa in the Hamaca Association Agreement.  By executing the Hamaca Guarantee, PDVSA acknowledged that it was "fully aware of the contents" of the Hamaca Association Agreement and "consent[ed] and accept[ed] all of the terms and conditions" thereof.[44]

55.     Ultimately, the objective of the Hamaca Project was to produce and upgrade extra-heavy crude oil, and market a new synthetic crude oil and the by-products (sulfur and coke) of the upgrading process.  As provided for in the Hamaca Association Agreement, the Hamaca Project was expected to extract 190,000 barrels per day of extra-heavy crude oil.[45]  After extraction, the extra-heavy crude oil would be mixed with a diluent and transported by pipeline to an upgrading plant at the José Industrial Complex on the

---

[42]   *Id.* at art. IV; **Exhibit C-19** Hamaca Confidential Preliminary Information Memorandum, Volume I, Morgan Stanley Dean Witter, August 2000 §§ VI-1 to VI-3.

[43]   **Exhibit C-1,** Hamaca Association Agreement at art. VIII.

[44]   **Exhibit C-2,** Hamaca Guarantee (Hamaca Association Agreement, Exhibit M) § 2.

[45]   **Exhibit C-19,** Hamaca Confidential Preliminary Information Memorandum, Volume I, Morgan Stanley Dean Witter, August 2000 §§ III-3 and III-4.

northeast coast of Venezuela.  The crude would then be processed into high-value syncrude (***Hamaca Syncrude***) and sold on the open market.[46]

56.     Towards the middle of 1999, ARCO advised the Hamaca Project participants that it did not want to remain an investor in the Project.  On 28 June 1999, the Claimant acquired an additional 20 percent interest in the Hamaca Association from ARCO.[47]   Texaco purchased the remaining 10 percent of ARCO's ownership interest, thereby raising its own equity participation in the Hamaca Project to 30 percent.  Thus, upon ARCO's exit, the Claimant held a 40 percent stake in the Hamaca Project, with Corpoguanipa holding the remaining 30 percent.

57.     As a result of the Claimant's significant financial and technical contributions, the Hamaca Project was highly successful.  The project dispatched its first shipment of crude in November 2001.[48]  Full syncrude production and its first commercial shipment took place on 20 October 2004,[49] thereby triggering the term of the Project, which would extend until 8 July 2037.[50]

## C.   THE RESPONDENTS HAVE WARRANTED INDEMNIFICATION IN THE EVENT OF DISCRIMINATORY ACTIONS UNDERTAKEN BY VENEZUELA

58.     Pursuant to the express terms of the Hamaca Association Agreement, Corpoguanipa agreed to indemnify the Claimant for economic damage suffered by virtue of Discriminatory Actions taken by Venezuela.  Section 14.2 provides:

---

[46]   *Id*.  Unlike Petrozuata Syncrude, Hamaca Syncrude can be processed in generic refineries without the need for significant refinery modifications.  *Id*.

[47]   **Exhibit C-18**, Phillips Petroleum Company Venezuela Limited Secretary's Certificate, Resolution of the Board of Directors, and Certificate of Incumbency, 28 June  1999; **Exhibit C-17**, Inter-Office Correspondence from K.L. Hedrick to The Executive Committee, Regarding Hamaca/LL-652 Asset Exchange & Phase II Development AFE, 25 June  1999.

[48]   **Exhibit C-21**, ChevronTexaco Press Release, ChevronTexaco and Partners Announce First Oil Production from the Hamaca Project in Venezuela's Orinoco Belt, 20 November 2001.

[49]   **Exhibit C-32**, Phillips Petroleum Company Venezuela Limited Report of Independent Auditors and Consolidated Financial Statements, as of 31 December 2006 and 2005, 6 March 2007, at 9.

[50]   **Exhibit C-1**, Hamaca Association Agreement § 14.2.

(a)   [Corpoguanipa] shall be required to compensate any Foreign Party in the manner described in this Article XIV, to the extent that the Party suffers a reduction of more than five percent (5%) in any Fiscal Year in its Reference Net Cash Flow as a result of one or more Discriminatory Actions (including Discriminatory Actions occurring after, but having an effect on the Reference Net Cash Flow from, such year) (any such Party, an "Affected Party"), with such reduction being determined by comparing, with respect to any Party in any Fiscal Year, such Party's Reference Net Cash Flow for such year, including the effect of an uncompensated Discriminatory Actions, with the Party's Reference Net Cash Flow for such year excluding the effect of the uncompensated Discriminatory Actions (such reduction, a "Material Adverse Effect") it being understood that any Discriminatory Actions would be considered unjust if they resulted, individually or in the aggregate, in a Material Adverse Effect.[51]

59.   The Hamaca Association Agreement defines Discriminatory Actions as follows:

'Discriminatory Actions' shall mean any change of Venezuelan national, state or municipal law, or any act or action with force of law, act of government (*actos de gobierno*), or action or decision of any Venezuelan national, state or municipal legislative or administrative authority (including any such action or decision resulting in a change in interpretation or application of Venezuelan law), which is (i) applicable to the Association, the Association Entities or a Party in its capacity as a participant in the Association or an Association Entity, (ii) unjust and (iii) not generally applicable to entities (both public and private) engaged on their own behalf (*e.g.*, excluding service contract providers in the performance of such service activities) in the hydrocarbon industry in Venezuela; provided that:

(1)   any change of Venezuela national, state or municipal law, or any act or action with force of law, act of government, or action or decision of any Venezuelan national, state or municipal legislative or administrative authority (including any such action or decision resulting in a change in interpretation or application of Venezuelan law) in respect of tax rates (including value added taxes, such as *impuestos a las ventas al mayor*, and the legal procedure established for its recovery), new taxes, financial burdens or charges for goods and services provided by governmental entities which are the equivalent of a tax (*i.e.*, financial burdens or charges on goods or services imposed by a governmental entity acting as the sole provider of such goods or services or in regulating an activity conducted under monopoly conditions) foreign exchange controls or the expropriation of the assets of, or a Party's interest in, the Association or Association Entities, will be considered Discriminatory Actions if they are

---

[51]   *Id.*

not generally applicable to corporations and other legal entities that are taxable in the same manner as corporations in Venezuela;

(2)    the application of methods to determine transfer pricing for the purpose of taxes payable in respect of Extra-Heavy Oil (as recovered or industrialized) or Commercial Production produced by the Parties in their capacity as participants in the Association or goods and services provided in connection with the Project activities shall be considered Discriminatory Actions if such methods are not generally consistent with internationally recognized transfer pricing principles for taxation;

(3)    a binding determination by any competent Venezuela authority that the Association Entities or the Parties in their capacity as participants in the Association or in the Association Entities, are subject to taxation under a regime less favorable to the Parties than paragraph *unique* of Article 9 of the Venezuelan Income Tax Law (*i.e.*, a regime less favorable to the Parties than that generally applicable to corporations and other legal entities that are taxable in the same manner as corporations in Venezuela) shall be considered a Discriminatory Action;

(4)    reductions or increases in the royalty rate applicable to the crude oil produced by the Parties in their capacity as participants in the Association, will not be considered Discriminatory Actions under this provision unless such changes result in a royalty rate for the Parties in their capacity as participants in the Association, in excess of the maximum rate specified by law for the hydrocarbon industry in general; and

(5)    the imposition of municipal taxes (*patente de industria y comercio*) on the Parties in their capacity as participants in the Association or on the Association Entities, in spite of the provisions of the Conditions, will be considered a Discriminatory Action only if the aggregate municipal tax burden on the Affected Party's gross revenue from Project activities exceeds four percent (4%) of the Affected Party's gross revenue from Project Activities in the relevant Fiscal Year, in which event the full amount of all municipal taxes will be taken into account in computing decreased Reference Net Cash Flow (calculated in accordance with Section 14.2(f)) for purposes of ascertaining whether the Affected Party has suffered a Material Adverse Effect (although the Affected Party will be compensated only for the decrease in Reference Net Cash Flow attributable to municipal taxes over four percent (4%)).

For the purposes of this Article XIV, 'act of government' (*actos de gobierno*) shall mean any act of the higher bodies of the executive power

directly based on the constitution of the Republic of Venezuela not related to formal law, but similarly enforceable.[52]

60.    If a Discriminatory Action causes the Claimant to suffer a Material Adverse Effect, then Section 14.2 requires Corpoguanipa to indemnify the Claimant.  Section 14.2 also sets out a formula to determine the amount of compensation, as well as applicable procedures for doing so.[53]

61.    Under the Hamaca Guarantee, PDVSA unconditionally guaranteed Corpoguanipa's performance of its obligations under the Hamaca Association Agreement.[54]

## D.    THE ACTIONS AGAINST THE CLAIMANT

62.    On 6 December 1998, Hugo Chávez was elected President of Venezuela.   Shortly thereafter, he obtained approval by referendum for a new Venezuelan Constitution and secured the authority to legislate by decree in certain areas.   Invoking his unilateral authority, on 13 November 2001, President Chávez issued a new Organic Hydrocarbons Law (the ***Hydrocarbons Law***).  The Law prohibited private companies from participating in the exploration, production, initial transportation, storage,   and   sale   of   natural hydrocarbons, unless they did so through minority participation in *empresas mixtas* (mixed companies) in which PDVSA owned more than a 50 percent interest.

63.    At the time the Hydrocarbons Law came into force, existing investors such as the Claimant received repeated assurances from Venezuela that the Hydrocarbons Law would not be applied retroactively and that it would not affect existing agreements, including the Hamaca Association Agreement.[55]   Such assurances were also consistent with Venezuelan law, including the well-known constitutional principle of non-retroactivity.

---

[52]   *Id.* § 14.1(b).

[53]   *Id.* § 14.2.

[54]   *See* **Exhibit C-2**, Hamaca Guarantee (Hamaca Association Agreement, Exhibit M) § 4.

[55]   *See, e.g.,* **Exhibit C-16**, *President-Elect Hugo Chávez Interviewed Following His Victory*, BBC SUMMARY OF WORLD BROADCASTS, 8 December 1998, at 2; **Exhibit C-20**, *Venezuela:  Foreign Oil Companies Worried by Chávez's "Historic" Oil Law Plans*, BBC WORLDWIDE MONITORING, 5 September 2001.

64.    However, between October 2004 (when commercial production commenced in the Hamaca Project) and June 2007, the Venezuelan government proceeded to dismantle the legal regime that had induced the Claimant and other foreign investors to invest in Venezuela's hydrocarbons sector.   Through the deliberate "steps" to "bur[y]" the *Apertura Petrolera* outlined in President Chávez's speech,[56] Venezuela devalued and then seized the Claimant's interest in the Hamaca Project for its shared benefit with the Respondents.   For their direct role in these expropriatory acts, the Respondents are liable for the full amount of damages suffered by the Claimant.   In addition, there are further distinct but related Discriminatory Actions for which the Claimant is entitled to compensation under the Hamaca Association Agreement and Hamaca Guarantee.

### 1.    Venezuela Eviscerated the Royalty Regime Guaranteed to the Claimant and upon which the Claimant Relied in Investing in the Hamaca Project

65.    As stated above, prior to making its investment, the Claimant had been promised a one percent royalty rate for nine years, with a maximum rate of 16⅔ percent thereafter.   Both promises were violated.   *First*, shortly after the Hamaca Project began commercial production, on 10 October 2004, Venezuela announced the Royalty Agreement Abrogation, through which it replaced the one percent royalty rate with a 16⅔ percent royalty rate.   *Second*, on 24 May 2006, it introduced the Extraction Tax, which further increased the applicable royalty rate from 16⅔ percent to 33⅓ percent.

### 2.    Venezuela Significantly Increased the Tax Rate for Extra-Heavy Crude Oil Projects, Including the Hamaca Project

66.    On 29 August 2006, the National Assembly approved a change in the income tax law that increased the tax rate for extra-heavy crude oil projects, including the Hamaca Project, from 34 to 50 percent, effective 1 January 2007.[57]   The standard corporate tax rate

---

[56]   *See* **Exhibit C-38**, Transcript of Aló Presidente Nº 288: Desde la Faja Petrolífera del Orinoco, Hugo Chávez Frías, President of the Bolivarian Republic of Venezuela, 29 July 2007, at 7-11 (transcript available from Servicio TvPrensa).

[57]   **Exhibit C-27**, *Law Partially Reforming the Income Tax Law*, OFFICIAL GAZETTE No. 38,529, published 25 September 2006; *see also* **Exhibit C-23**, *Venezuela Will Raise the Income Tax in the Orinoco Belt from 34 to 50%: The Companies Affected Are ExxonMobil, Statoil, ConocoPhillips, Chevron and BP*, REPORTE, 16 June 2005.

remained at 34%.   The Income Tax Increase substantially reduced the value of the Claimant's interest in the Hamaca Project.

### 3.   Venezuela Completed Its Expropriation of the Claimant's Investment in the Hamaca Project

67.   Having substantially reduced the value of the Claimant's interest in the Hamaca Project, Venezuela, in August 2006, revealed its further plan to:  (*a*) strip the Hamaca Project (and all associated entities) of all rights with respect to the exploration, production, upgrading, and commercialization of extra-heavy crude oil and (*b*) replace that project with an *empresa mixta*, majority owned and controlled by PDVSA, that would be granted all of the rights taken away from the Hamaca Project.[58]

68.   This plan was formalized on 26 February 2007 as the fifth and final "step" to expropriate the Claimant's interest in the Hamaca Project, when President Chávez announced on his weekly television and radio broadcast that he was issuing the Nationalization Decree, which would require the repatriation of the Hamaca Project, among others.[59]   The Nationalization Decree specified that all extra-heavy crude oil projects in the Orinoco Oil Belt, as well as all projects operating under exploration at risk and profit sharing agreements were to be expropriated through migration to *empresas mixtas*.[60]   The Nationalization Decree further provided that PDVSA would own at least 60 percent of the shares in the new companies and did not provide for compensation.   The Nationalization Decree allowed the affected foreign investors four months to agree to terms for the expropriation.

---

[58]   *See* **Exhibit C-25**, Ameriven Non-Binding Term Sheet for Migration from Association, August 2006.

[59]   **Exhibit C-30**, Aló Presidente Nº 268, 26 February 2007 (available at:  www.alopresidente.gob.ve).

[60]   **Exhibit C-31**, *Decree With Rank, Value and Force of Law of Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Risk and Profit Sharing Exploration Agreements, Decree No. 5,200,* OFFICIAL GAZETTE No. 38,632, published 26 February 2007.

69.    On 1 May 2007, with troops standing by, the Respondents seized control of operations of the Hamaca Project.[61]  The Claimant's operational personnel were no longer admitted on site.

70.    Four months to the day after the Nationalization Decree was announced, on 26 June 2007, then Energy Minister Rafael Ramírez – who also served as the President of PDVSA – announced that the oil investments of the Claimant in Venezuela had been expropriated without compensation.[62]

71.    The Expropriation of the Claimant's interest in the Hamaca Project was completed with the formal ratification of the Nationalization Decree by the Venezuelan National Assembly pursuant to the Law on Effects published on 8 October 2007.[63]

**E.    THE RESPONDENTS WILLFULLY BREACHED THEIR OBLIGATIONS UNDER THE HAMACA ASSOCIATION AGREEMENT, THE HAMACA GUARANTEE, AND VENEZUELAN LAW**

72.    The Respondents played an instrumental role in stripping the Claimant of its rights under the Hamaca Association Agreement.  There was direct coordination between the Ministry and the Respondents in conceiving and carrying out the fiscal measures and ultimate expropriation, with Minister Ramírez serving in the dual role as head of the Ministry and President of PDVSA.  President Chávez in his speech recounting the "steps" taken to dismantle the *Apertura Petrolera* specifically commended Minister Ramírez, saying "[w]e have a great friend heading up PDVSA[.]"[64]

73.    PDVSA also played a critical role in consummating the expropriation by entering into a Memorandum of Understanding dated 26 June 2007 with certain companies involved in

---

[61]    *See also* **Exhibit C-35**, Photographic evidence of the role played by the Respondents, taken 1 May 2007.

[62]    *See, e.g.*, **Exhibit C-36**, PDVSA Press Release, PDVSA controls 78% of shares in Orinoco Oil Belt businesses, 26 June 2007.

[63]    **Exhibit C-39**, *Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements*, OFFICIAL GAZETTE No. 38,785 , published 8 October 2007.

[64]    **Exhibit C-38**, Transcript of Aló Presidente Nº 288:  Desde la Faja Petrolífera del Orinoco, Hugo Chávez Frías, President of the Bolivarian Republic of Venezuela, 29 July 2007, at 10 (transcript available from Servicio TvPrensa).

the Orinoco Oil Belt (the **MOU**).  This MOU provided for the migration of investments held by all foreign investors to *empresas mixtas*[65] and, as Minister Ramírez explained in a public address, enabled PDVSA to double its average participation in and ownership of Orinoco Oil Belt projects – precisely at the Claimant's and other foreign investors' expense.[66]

74.    The Respondents' conduct is irreconcilable with their contractual promises to the Claimant, and constitutes a willful breach of the obligations and duty of good faith and fair dealing owed to the Claimant, both under the Hamaca Association Agreement and the Hamaca Guarantee pursuant to Article 1.160 of the Venezuelan Civil Code (or, alternatively, *hecho ilícito* (tortious interference) under Venezuelan law).[67]    The Respondents are required to provide the Claimant full recompense of all damages suffered, and the nature of their conduct disentitles them from relying on any contractual provision that could have the effect of limiting liability for their willful actions.

F.    **CORPOGUANIPA MUST PARTIALLY INDEMNIFY THE CLAIMANT FOR THE DISCRIMINATORY ACTIONS IN ACCORDANCE WITH THE HAMACA ASSOCIATION AGREEMENT**

75.    At a minimum and separately from the claims arising from the breach of contract (or, alternatively, *hecho ilícito* (tortious interference)), Corpoguanipa is obligated under the Hamaca Association Agreement – as a result of Venezuela's Discriminatory Actions – to pay partial indemnification in accordance with the Hamaca Association Agreement's compensation formula.  In effect, Corpoguanipa is required to act as a limited insurer of the Claimant's damages arising from Discriminatory Actions.

---

[65]    **Exhibit C-37**, Transcript of Speech by Rafael Ramírez, Signing of the Memoranda of Understanding of the Succession Agreements for Mixed Companies, 26 June 2007.

[66]    *Id.*

[67]    Civil Code of Venezuela at art. 1.160.

1.      **The Income Tax Increase Resulted in Unjust Discriminatory Treatment Against the Claimant**

76.     The August 2006 Income Tax Increase, effective 1 January 2007, constituted a Discriminatory Action under the Hamaca Association Agreement because it was not generally applicable to other entities "taxable in the same manner" as corporations in Venezuela.[68]   The Income Tax Increase raised the tax rate on the Hamaca Project to 50 percent, substantially in excess of the general corporate tax rate of 34 percent.[69]   This disparity enlivens the protections contained in Article 14.1(b)(1) of the Hamaca Association Agreement, which defines "Discriminatory Action" to include tax measures that are "not generally applicable to corporations and other legal entities that are taxable in the same manner as corporations in Venezuela."[70]

77.     Because the 50 percent income tax rate was not generally applicable to most enterprises in Venezuela, it constituted a Discriminatory Action under the Hamaca Association Agreement.

78.     Corpoguanipa is thus obligated to partially indemnify the Claimant for each fiscal year that the Claimant suffered loss as a result of the Income Tax Increase.

2.      **The Expropriation Resulted in Unjust Discriminatory Treatment Against the Claimant**

79.     The Expropriation is a Discriminatory Action under the Hamaca Association Agreement. The measures that led to the confiscation of the Hamaca Project were paradigmatic acts of discrimination.   Although it was not known at the time, the Royalty Agreement Abrogation and Extraction Tax were – as President Chávez made clear in his July 2007 speech – the first and third "steps" in his administration's initiative to expropriate foreign oil investments induced through the *Apertura Petrolera*, including CPH's investment in the Hamaca Project.   The confiscatory measures alone, and when viewed together with

---

[68]   **Exhibit C-1**, Hamaca Association Agreement § 14.1(b).

[69]   *See supra* ¶66.

[70]   **Exhibit C-1**, Hamaca Association Agreement § 14.1(b)(1).

the earlier evisceration of the royalty regime and Income Tax Increase,  give rise to liability for Corpoguanipa pursuant to paragraph 14.1(b) of the definition of "Discriminatory Action," which includes:

> [A]ny change of Venezuelan national, state or municipal law, or any act or action with force of law, act of government, or action or decision of any Venezuelan national, state or municipal legislative or administrative authority … which are the equivalent of … the expropriation of the assets of, or a Party's interest in, the Association or Association Entities.[71]

80. Corpoguanipa is thus obligated to partially indemnify the Claimant for each fiscal year that it suffered loss as a result of the Expropriation.

### G. PDVSA MUST PARTIALLY INDEMNIFY THE CLAIMANT FOR THE DISCRIMINATORY ACTIONS IN ACCORDANCE WITH THE HAMACA GUARANTEE

81. As guarantor for Corpoguanipa, PDVSA has the obligation to ensure payment of compensation for each of the Discriminatory Actions set forth above:

> The Guarantor, as joint and several guarantor and irrevocable and primary obligor, hereby irrevocably and unconditionally guarantees to each of the Foreign Parties, full and prompt liquidation of all payments which the Corpoven Affiliate is responsible to make under the terms of the Agreement and the Related Agreements in each case, either as payment of a contractual obligation, damages (including "Damages" and "Purchase Price" as defined in Article XIV of the Agreement), indemnification or other types of payments, including, but not limited to the Corpoven Affiliate's share of all Project Contributions.[72]

82. In the absence of immediate and complete payment by Corpoguanipa, PDVSA is obligated to partially indemnify the Claimant for each fiscal year that the Claimant suffered a Material Adverse Effect as a result of the Income Tax Increase and the Expropriation.

---

[71] *Id.*

[72] **Exhibit C-2,** Hamaca Guarantee, ¶3.

29

## H.    IN RESPONSE TO THE DISCRIMINATORY ACTIONS, CONOCOPHILLIPS REPEATEDLY COMMUNICATED ITS COMPLAINTS

83.    In response to the Discriminatory Actions, ConocoPhillips repeatedly communicated its complaints to Corpoguanipa.[73]   In a letter dated 29 November 2006 sent to Eulogio Del Pino, a Director of Corpoguanipa (now President of PDVSA), among others, ConocoPhillips, on behalf of the Claimant, protested the Royalty Agreement Abrogation, the Extraction Tax, and the Income Tax Increase, and stated that it "reserved all of its rights under Venezuelan and International Law with respect to such changes."[74] Similarly, in a letter dated 6 March 2007 to Mr. Del Pino, the Claimant objected to the Nationalization Decree, observing that "[it] has not accepted the transfer to one of the state companies" of the Hamaca Project.[75]   As in its other prior letter, the Claimant generally reserved its rights and furthermore specifically reserved "its rights to complaints and lawsuits under . . . the [Hamaca] Association Agreement."[76]   In the same way, in a letter dated 12 April 2007 to Mr. Del Pino and others, ConocoPhillips, on behalf of the Claimant, again specifically reserved its rights under the Hamaca Association Agreement, observing that "[n]othing in this letter should be interpreted to prejudice any rights of ConocoPhillips under, inter alia . . . the Hamaca [] Association Agreement dated November 10th, 1995, as amended, and all associated or related agreements . . . such rights being fully reserved by ConocoPhillips."[77]   Through

---

[73]   *See e.g.*, **Exhibit C-28**, Letter from A. Roy Lyons, President, ConocoPhillips Latin America, to Dr. Bernard Mommer, Vice Minister of Hydrocarbons, *et al.*, of 18 October 2006 (ConocoPhillips reserving rights in response to compulsory *empresa mixta* migration); **Exhibit C-22**, Minutes of Petrolera Hamaca, S.A., Operations Committee Meeting No. 04-07, 30 November 2004 (ConocoPhillips observing to Eulogio Del Pino and others that the Royalty Agreement Abrogation was a "radical change which [ConocoPhillips] disagreed with").

[74]   **Exhibit C-29**, Letter from A. Roy Lyons, President, ConocoPhillips Latin America, to Dr. Bernard Mommer, Vice Minister of Hydrocarbons, *et al.*, 29 November 2006.

[75]   **Exhibit C-33**, Letter from A. Roy Lyons, President, ConocoPhillips Latin America, to Eulogio Del Pino, 6 March 2007.

[76]   *Id.*

[77]   **Exhibit C-34**, Letter from A. Roy Lyons, President, ConocoPhillips Latin America, to Minister Rafael Ramírez *et al.*, 12 April 2007.

communications such as these, ConocoPhillips left the Respondents in no doubt as to its and Claimant's opposition to the Discriminatory Actions.

I.   **CONOCOPHILLIPS HAS PURSUED THE ONLY OTHER PRACTICABLE REMEDY FOR NEARLY SEVEN YEARS**

84.   ConocoPhillips has pursued the only other practicable remedy, ICSID Arbitration, for nearly seven years.

85.   On 3 September 2013, the ICSID Tribunal rendered its Decision on Jurisdiction and Liability.  The issues determined in that Decision were reconfirmed on 10 March 2014, when the ICSID Tribunal issued its decision denying Venezuela's Request for Reconsideration.  Thus, the ICSID Tribunal confirmed its determinations that:

(a)   Venezuela was guilty of an unlawful expropriation, and that the damages resulting therefrom would be determined in a second quantum phase of the ICSID proceedings, and;

(b)   the claims arising from the Royalty Agreement Abrogation, the Extraction Tax, and the Income Tax Increase were outside the scope of the BIT.[78]   The ICSID Tribunal also determined that it had no jurisdiction over claims advanced under Article 22 of Venezuela's Investment Law.[79]   The ICSID Tribunal, however, did not question the ICSID Claimants' substantive entitlements with regard to those claims through alternative remedies.

86.   In the light of the ICSID decision, and the law applicable thereto, the Claimant now proceeds to commence these proceedings in which it exclusively seeks relief in connection with the Hamaca Association Agreement and the Hamaca Guarantee.  In making these claims, the Claimant emphasizes that it does not seek double recovery for the damage it has suffered.  To the extent that the Claimant is awarded damages in the ICSID Arbitration and receives payment of such an award, the Respondents will receive

---

[78]   **Exhibit C-40**, Decision on Jurisdiction and Liability, ¶¶318–32.

[79]   *Id.*, ¶¶225–63.

an appropriate offset from their obligations arising from an award in these proceedings, and *vice versa*.

## VIII.   RELIEF REQUESTED

87.   As a consequence of the foregoing, the Claimant respectfully requests that the Arbitral Tribunal render an award:

(a)   Declaring that Corpoguanipa willfully breached its contractual obligations and duty of good faith and fair dealing owed to the Claimant under the Hamaca Association Agreement, and that Corpoguanipa  is liable fully to compensate the Claimant accordingly;

(b)   Declaring that PDVSA is liable to indemnify the Claimant for Corpoguanipa's breach of its contractual obligations and duty of good faith and fair dealing owed to the Claimant under the Hamaca Association Agreement, and that PDVSA is liable fully to compensate the Claimant accordingly;

(c)   Declaring that PDVSA willfully breached its contractual obligations and duty of good faith and fair dealing owed to the Claimant under the Hamaca Guarantee, and that PDVSA is liable fully to compensate the Claimant accordingly;

(d)   Declaring that the Respondents' interference with the Claimant's contractual rights constitutes, alternatively, *hecho ilícito* (tortious interference)  under Venezuelan law, and that the Respondents are liable to compensate the Claimant accordingly;

(e)   Declaring that the Income Tax Increase constitutes a Discriminatory Action under the Hamaca Association Agreement;

(f)   Declaring that the Expropriation constitutes a Discriminatory Action under the Hamaca Association Agreement;

(g)     Declaring that Corpoguanipa is liable to indemnify the Claimant for the Discriminatory Actions under the terms of the Hamaca Association Agreement in an amount to be quantified;

(h)     Declaring that PDVSA is liable to indemnify the Claimant for the Discriminatory Actions under the terms of the Hamaca Guarantee in an amount to be quantified;

(i)     Awarding damages  in an amount to be quantified;

(j)     Awarding indemnification for Discriminatory Actions in an amount to be quantified;

(k)     Awarding pre-award compound interest, for the full effects of the Discriminatory Actions, at a rate to be fixed by the Tribunal, to run from the latest damages update to the date of the Award;

(l)     Awarding post-award compound interest at a rate to be fixed by the Tribunal, to run from the date of Award until the date of full and final payment;

(m)    Requiring the Respondents to bear the costs of the arbitration as set out in Article 37(1) of the ICC Rules; and

(n)     Granting such additional or other relief as may be just under the law.

88.   The Claimant reserves the right to amend or supplement this Request or to make additional claims or revisions to its claims.  This includes but is not limited to additional claims arising from further losses suffered by the Claimant as a result of the Law on Effects that may arise in the future.

Respectfully submitted,
10 October 2014

Jan Paulsson
Constantine Partasides QC
Luke Sobota

THREE CROWNS

D. Brian King
Elliot Friedman

Freshfields Bruckhaus Deringer US LLP

34