# EXHIBIT G

INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

CONOCOPHILLIPS PETROZUATA B.V.

CLAIMANT

-V-

PETRÓLEOS DE VENEZUELA, S.A.
AND
PDVSA PETRÓLEO, S.A.

RESPONDENTS

# REQUEST FOR ARBITRATION

## 10 OCTOBER 2014

THREE CROWNS



# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. THE PARTIES.....................................................................................................6

III. THE ARBITRATION AGREEMENTS........................................................................9

    A. THE ARBITRATION AGREEMENT IN THE PETROZUATA ASSOCIATION AGREEMENT PROVIDES FOR ICC ARBITRATION ...............................................................9

    B. THE ARBITRATION AGREEMENT IN THE PETROZUATA GUARANTY PROVIDES FOR ICC ARBITRATION ...............................................................................9

IV. GOVERNING LAW, PLACE, AND LANGUAGE OF THE ARBITRATION .............11

V. CONSTITUTION OF THE TRIBUNAL ..............................................................11

VI. REQUEST TO CONSOLIDATE .........................................................................12

VII. NATURE AND CIRCUMSTANCES OF THE DISPUTE............................................13

    A. VENEZUELA MADE COMMITMENTS TO INDUCE FOREIGN INVESTMENT IN VENEZUELA .............................................................................................13

    B. IN RELIANCE ON VENEZUELA'S COMMITMENTS, THE CLAIMANT INVESTED IN THE PETROZUATA PROJECT.................................................................15

    C. THE RESPONDENTS HAVE WARRANTED INDEMNIFICATION IN THE EVENT OF DISCRIMINATORY ACTIONS UNDERTAKEN BY VENEZUELA ........................17

    D. THE ACTIONS AGAINST THE CLAIMANT ....................................................19

        1. Venezuela Eviscerated the Royalty Regime Guaranteed to the Claimant and upon which the Claimant Relied in Investing in the Petrozuata Project.........20

        2. Venezuela Significantly Increased the Tax Rate for Extra-Heavy Crude Oil Projects, Including the Petrozuata Project .......................................20

        3. Venezuela Completed Its Expropriation of the Claimant's Investment in the Petrozuata Project ...........................................................................21

    E. THE RESPONDENTS WILLFULLY BREACHED THEIR OBLIGATIONS UNDER THE PETROZUATA ASSOCIATION AGREEMENT, THE PETROZUATA GUARANTY, AND VENEZUELAN LAW .....................................................................................22

    F. PDVSA PETRÓLEO MUST PARTIALLY INDEMNIFY THE CLAIMANT FOR THE DISCRIMINATORY ACTIONS IN ACCORDANCE WITH THE PETROZUATA ASSOCIATION AGREEMENT ..........................................................................23

        1. The Income Tax Increase Resulted in Unjust Discriminatory Treatment Against the Claimant.............................................................................24

        2. The Expropriation Resulted in Unjust Discriminatory Treatment Against the Claimant..........................................................................................24

G. PDVSA MUST PARTIALLY INDEMNIFY THE CLAIMANT FOR THE DISCRIMINATORY ACTIONS IN ACCORDANCE WITH THE PETROZUATA GUARANTY...........................................26

H. IN RESPONSE TO THE DISCRIMINATORY ACTIONS, CONOCOPHILLIPS REPEATEDLY COMMUNICATED ITS COMPLAINTS.........................................................................26

I. THE CLAIMANT HAS PURSUED THE ONLY OTHER PRACTICABLE REMEDY FOR NEARLY SEVEN YEARS.........................................................................27

VIII. RELIEF REQUESTED.........................................................................28

## I.   INTRODUCTION

1.   This Request for Arbitration (***Request***) is submitted on behalf of ConocoPhillips Petrozuata B.V. (***the Claimant***, ***CPZ***) against Petróleos de Venezuela, S.A. (***PDVSA***) and PDVSA Petróleo, S.A. (***PDVSA Petróleo***, and together with PDVSA, the ***Respondents***) in accordance with Article 4 of the Arbitration Rules of the International Chamber of Commerce, in force as of 1 January 2012 (the ***ICC Rules***).

2.   This dispute arises from the Respondents' involvement in the unlawful confiscation of the Claimant's interest in a major oil project in Venezuela (the ***Petrozuata Project***), and from the Respondents' contractual undertakings and guarantees relating to the Petrozuata Project.

3.   The principal contract for the Petrozuata Project, entitled the "Association Agreement" (the ***Petrozuata Association Agreement***),[1] was signed by the predecessors in interest of the Claimant and PDVSA's subsidiary, PDVSA Petróleo, on 10 November 1995.  On the same day, PDVSA separately issued a guaranty (the ***Petrozuata Guaranty***) that was attached to the Petrozuata Association Agreement.[2]

4.   The Petrozuata Association Agreement created a joint venture between the predecessors in interest of PDVSA Petróleo and CPZ to develop extra-heavy crude oil in an area of the Zuata region of Venezuela's Orinoco Oil Belt.[3]  The incorporated joint venture was known as Petrolera Zuata, Petrozuata C.A. (***Petrozuata C.A.***).

---

[1]   **Exhibit C-1**, Association Agreement between Maraven S.A. and Conoco Orinoco Inc., 10 November 1995, 18 June 1997 as modified.  For clarity, annexed as **Exhibits C-1** and **C-1A** are complete copies of the original Petrozuata Association Agreement, dated 10 November 1995, in English and Spanish.  **Exhibit C-1** further includes the modified version of the Petrozuata Association Agreement, dated 18 June 1997 and all references within this Request are to that modified version.

[2]   **Exhibit C-2**, Guaranty and Indemnification Agreement between Conoco Orinoco Inc. and Petróleos de Venezuela, S.A., 10 November 1995 (referred to hereinafter as the "Petrozuata Guaranty" (Petrozuata Association Agreement, Exhibit P)).

[3]   In the interests of simplicity, the parties' respective predecessors in interest will be referred to as "PDVSA Petróleo" and "CPZ" throughout this Request.

5.      Under the Petrozuata Association Agreement, PDVSA Petróleo must partially indemnify the Claimant for specified "Discriminatory Actions" by the Bolivarian Republic of Venezuela (*Venezuela*) in accordance with the compensation formula set forth in the Petrozuata Association Agreement.

6.      In the Petrozuata Guaranty, PDVSA has unconditionally guaranteed PDVSA Petróleo's performance of the Petrozuata Association Agreement, including the obligation to indemnify the Claimant should a Discriminatory Action occur.[4]

7.      The Petrozuata Association Agreement and the Petrozuata Guaranty were executed as part of the *Apertura Petrolera* (the ***Oil Sector Opening***), a broader initiative by the Venezuelan government in the early 1990s to encourage private investment in the oil industry.  Based in part on the contractual obligations of PDVSA and PDVSA Petróleo, the Claimant made substantial financial and capital investments in the Petrozuata Project, which achieved commercial production in April 2001.

8.      The Claimant held its interests in the Petrozuata Project until 26 June 2007, when Venezuela confiscated the Petrozuata Project with the Respondents' collaboration and assistance.  This confiscation of the Claimant's entire interest in the Petrozuata Project[5] was the last in a series of interconnected governmental actions targeting the Claimant and other foreign oil companies operating in Venezuela.  On 29 July 2007, then President Hugo Chávez described the process culminating in the expropriation of the Petrozuata Project (along with others) as the "dismantling" and "bur[ial]" of the *Apertura Petrolera*,

---

[4]      **Exhibit C-2,** Petrozuata Guaranty (Petrozuata Association Agreement, Exhibit P).

[5]      This confiscation followed a seizure of the Petrozuata Project on May Day, *i.e.*, 1 May 2007; *see infra* ¶60.  On 11 September 2007, the Venezuelan National Assembly formalized the confiscation by enacting the Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements (the ***Law on Effects***), signed by President Chávez on 5 October 2007.  **Exhibit C-29**, *Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements*, OFFICIAL GAZETTE No. 38,785, published 8 October 2007.  As decreed by Article 1 of that Law on Effects, the Petrozuata Association Agreement was purportedly terminated as of the date of its publication in the Official Gazette, *i.e.*, 8 October 2007.  *Id.* at art. 1.  *See also* **Exhibit C-22**, *Decree With Rank, Value and Force of Law of Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Risk and Profit Sharing Exploration Agreements, Decree No. 5,200,* OFFICIAL GAZETTE No. 38,632, published 26 February 2007.

which he dubbed "the neoliberal, colonialist giveaway Project."[6]  Each of the events at issue in this case was detailed by President Chávez in his description of the five "steps" comprising the expropriation (the ***Discriminatory Campaign***):[7]

(a)   *First*, starting in October 2004:  Venezuela (i) unilaterally abrogated a Royalty Agreement that had been executed in respect of the Claimant's investment and imposed instead a 16⅔ percent royalty rate (the ***Royalty Agreement Abrogation***); and, in May 2006, (ii) proceeded to introduce a new oil tax (the ***Extraction Tax***), which effectively raised the royalty rate to 33⅓ percent.  President Chávez described the Royalty Agreement Abrogation and the Extraction Tax as "step one" and "step three," respectively, of the Discriminatory Campaign.[8]

(b)   *Second*, effective 1 January 2007:  Venezuela eliminated the income tax regime that it had enacted to induce investment in the extra-heavy crude oil projects, raising the applicable income tax rate from 34 percent to 50 percent (the ***Income Tax Increase***).  President Chávez described the Income Tax Increase as "step four" of the Discriminatory Campaign.

(c)   *Third*, beginning in February 2007:  Venezuela (i) having already appropriated to itself a substantial amount of the value of Claimant's interest in the Petrozuata Project; (ii) issued a nationalization decree-law (the ***Nationalization Decree***) mandating that PDVSA take over all foreign majority-owned oil projects in Venezuela, including the Petrozuata Project; (iii) caused PDVSA Petróleo, with troops standing by, to assume control over operations at the Petrozuata Project on 1 May 2007; and (iv) publicly announced that it had expropriated the Claimant's interests in the Project (together the ***Expropriation***).  The Nationalization Decree was described by President Chávez as "step five."

---

6    **Exhibit C-28**, Transcript of Aló Presidente Nº 288:  Desde la Faja Petrolífera del Orinoco, Hugo Chávez Frías, President of the Bolivarian Republic of Venezuela, 29 July 2007, at 3, 6, 7 (transcript available from Servicio TvPrensa).

7    *Id*. at 7-11.

8    *Id*. at 8, 10.  According to President Chávez, "step two" was the increase of the royalty rate to 30% for certain projects outside of the Orinoco Oil Belt.  *See id*. at 8-9.

9.     The confiscation of the Petrozuata Project was formally ratified by the Venezuelan National Assembly pursuant to the Law on Effects, which was published on 8 October 2007.[9]  The Law on Effects purported to bring the Petrozuata Association Agreement to an end thereby completing the wrongful Expropriation.

10.    The Respondents had a direct and instrumental role in these "steps," through which they secured for themselves the value of the Claimant's interest in the Petrozuata Project. They actively worked to effect a series of measures to destroy the Petrozuata Association Agreement that they had undertaken and guaranteed would be fully performed.

11.    The Respondents' conduct constitutes willful breach of contract (or, alternatively, *hecho ilícito* (tortious interference) under Venezuelan law), and requires that the Respondents make the Claimant whole for the entirety of the damages it has suffered as a result.

12.    At a minimum, the Respondents are obligated to partially indemnify the Claimant pursuant to the Petrozuata Association Agreement and Petrozuata Guaranty for the Discriminatory Actions to be identified and explained below.

13.    In response to the Discriminatory Campaign, the Claimant, along with its corporate parent ConocoPhillips Company (***ConocoPhillips***), repeatedly communicated its complaints to PDVSA Petróleo.  They further pursued the only other practical remedy for nearly seven years.  Promptly following the Expropriation, the Claimant, along with ConocoPhillips and two of the latter's other Dutch subsidiaries – ConocoPhillips Hamaca B.V. (***CPH BV***) and ConocoPhillips Gulf of Paria B.V. (***CPG***) (collectively, the ***ICSID Claimants***) – commenced arbitration against Venezuela before the International Centre for Settlement of Investment Disputes (the ***ICSID Arbitration***) pursuant to the Netherlands-Venezuela Bilateral Investment Treaty (the ***BIT***).  The respondent in the ICSID Arbitration, Venezuela, is not a signatory to the Petrozuata Association Agreement or the Petrozuata Guaranty, nor is it a named party to these ICC proceedings.

---

[9]     **Exhibit C-29**, *Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements*, OFFICIAL GAZETTE No. 38,785, published 8 October 2007.

Venezuela is the sole respondent in the ICSID Arbitration and its obligations arise in that action under a separate legal instrument, the BIT.

14.   On 3 September 2013, the tribunal in the ICSID Arbitration (the ***ICSID Tribunal***) rendered a Decision on Jurisdiction and the Merits (the ***Decision on Jurisdiction and Liability***), in which it held that Venezuela had violated the BIT by illegally expropriating the ICSID Claimants' investments in the Petrozuata Project, as well as their investments in two additional projects.[10]   On 8 September 2013, Venezuela sought to have the ICSID Tribunal reconsider its decision; its motion was denied by a reasoned decision on 10 March 2014.

15.   Although the ICSID Tribunal found in favor of the ICSID Claimants' expropriation claims, it held that the claims arising from the Royalty Agreement Abrogation, the Extraction Tax, and the Income Tax Increase were outside the scope of the BIT.[11]   The ICSID Tribunal, however, did not question the ICSID Claimants' substantive entitlements with regard to those claims through alternative remedies.   As a result of that ruling, these ICC proceedings are the only other practicable legal recourse for the Claimant's injuries flowing from the Royalty Agreement Abrogation, the Extraction Tax, and the Income Tax Increase.   These claims are now presented alongside all other claims flowing from the Respondents' adverse conduct.   At this time, the ICSID Arbitration remains ongoing in order to determine the quantum of compensation that Venezuela must pay under international law for its illegal expropriation in breach of the BIT.

16.   The Claimant now brings these separate ICC proceedings seeking redress against the Respondents under the Petrozuata Association Agreement and applicable Venezuelan law.

---

[10]   **Exhibit C-30**, *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on Jurisdiction and the Merits, 3 September 2013 (referred to hereinafter as the "Decision on Jurisdiction and Liability") ¶¶361–402.

[11]   *Id.*  ¶¶318–32.   The ICSID Tribunal also determined that it had no jurisdiction over claims advanced under Article 22 of Venezuela's Investment Law.  *See id.* ¶¶225–63.

## II.    THE PARTIES

17.    The Claimant is a company incorporated under the laws of The Kingdom of the
Netherlands with its registered offices at:

> Zurich Tower (15th Floor)
> Muzenstraat 89
> 2511 WB Den Haag
> The Netherlands
>
> Tel:   +31 70 4262 174
> Fax:   +31 70 4262 111

18.    The Claimant is presently a wholly-owned subsidiary of ConocoPhillips[12] and its
predecessor in interest is Conoco Orinoco Inc., the ConocoPhillips entity that executed
the Petrozuata Association Agreement.

19.    The Claimant held a 50.1 percent interest in the Petrozuata Project.  The Claimant was
incorporated in July 2005 as a part of ConocoPhillips' decision to restructure its
Venezuelan investments through Dutch subsidiaries.[13]

---

[12]   Conoco Inc. (*Conoco*) and Phillips Petroleum Company (*Phillips*) merged into ConocoPhillips, a corporation
incorporated under the laws of the State of Delaware, on 30 August 2002.

[13]   On 26 July 2005, the Claimant was incorporated with Conoco Orinoco Inc. as its sole shareholder. **Exhibit C-
15**, ConocoPhillips Petrozuata B.V. Deed of Incorporation and Articles of Association, 26 July 2005. The
following day, Conoco Orinoco Inc. transferred its entire ownership interest in Conoven Holding Ltd. to the
Claimant.   **Exhibit C-16**, Action of the Board of Directors of Conoco Orinoco Inc. attaching a Board
Resolution, 27 July 2005; **Exhibit C-17**, Shareholder's Resolution of Conoco Orinoco Inc., 27 July 2005.  On
11 August 2005, Conoven Holding Ltd. transferred its entire ownership interest in Conoco Venezuela Holding,
C.A. (a Venezuelan company that at the time was a direct 50.1 percent owner of the Petrozuata Association) to
the Claimant. These transfers were duly registered in the Venezuelan Mercantile Registry and in the Ministry's
Division of Foreign Investment.  Finally, as a result of the liquidation of Conoco Venezuela Holding, C.A., its
shares in Petrozuata C.A. were transferred to Claimant, and all of its rights and obligations were assigned to the
Claimant.

20.     The Claimant is represented in this arbitration by Three Crowns LLP and Freshfields Bruckhaus Deringer US LLP.  All correspondence and notices to the Claimant relating to this arbitration should be addressed to:

> Constantine Partasides QC
> Three Crowns LLP
> 1 King Street
> London EC2V 8AU
> United Kingdom
>
> Tel:  +44 20 3530 7950
> Email:  constantine.partasides@threecrownsllp.com
>
> Jan Paulsson
> Three Crowns LLP
> 601 13th Street NW, Suite 360
> Washington, DC 20005
> United States of America
>
> Tel:  +1 202 540 9470
> Email:  jan.paulsson@threecrownsllp.com
>
> Luke Sobota
> Three Crowns LLP
> 601 13th Street NW, Suite 360
> Washington, DC 20005
> United States of America
>
> Tel:   +1 202 540 9477
> Email:  luke.sobota@threecrownsllp.com
>
> D. Brian King
> Freshfields Bruckhaus Deringer US LLP
> 601 Lexington Avenue, 31st Floor
> New York, NY 10022
> United States of America
>
> Tel:   +1 212 277 4020
> Email:  brian.king@freshfields.com

> Elliot Friedman
> Freshfields Bruckhaus Deringer US LLP
> 601 Lexington Avenue, 31st Floor
> New York, NY 10022
> United States of America
>
> Tel:   +1 212 230 4666
> Email:  elliot.friedman@freshfields.com

21.    Respondent PDVSA is the national oil company of Venezuela.   It is a corporation organized and existing under the laws of Venezuela.  Venezuela is the sole shareholder of PDVSA.  PDVSA's present registered address is:

> Petróleos de Venezuela, S.A.
> Avenida Libertador
> Edificio Petróleos de Venezuela
> Urb. La Campiña
> Caracas
> Venezuela

22.    Respondent PDVSA Petróleo is a corporation organized under the laws of Venezuela. PDVSA Petróleo is a wholly-owned subsidiary of PDVSA and is the successor in interest of Maraven S.A. (**Maraven**).  Maraven executed the Petrozuata Association Agreement with Conoco Orinoco Inc., and PDVSA Petróleo, as its successor in interest, was the PDVSA affiliate holding a participation interest in the Petrozuata Association when the Claimant's interests were ultimately expropriated.[14]    PDVSA Petróleo's present registered address is:

> PDVSA Petróleo, S.A.
> Avenida Libertador
> Edificio Petróleos de Venezuela
> Urb. La Campiña
> Caracas
> Venezuela

---

[14]   On 1 January 1998, Maraven S.A. merged with Lagoven S.A. and Corpoven S.A. to form PDVSA Petróleo y Gas, S.A., which in May 2001 changed its name to PDVSA Petróleo.

## III.    THE ARBITRATION AGREEMENTS

23.    In accordance with Section 13.16 of the Petrozuata Association Agreement and Section 4
of the Petrozuata Guaranty, the dispute submitted in this Request is subject to arbitration
in accordance with the ICC Rules.

### A.    THE ARBITRATION AGREEMENT IN THE PETROZUATA ASSOCIATION AGREEMENT PROVIDES FOR ICC ARBITRATION

24.    Section 13.16 of the Petrozuata Association Agreement provides that "[a]ll disputes
arising in connection with the present Agreement" shall be finally settled through ICC
arbitration before a three-member arbitral tribunal in New York, in accordance with
Venezuelan law:

> All disputes arising in connection with the present Agreement shall be
> finally settled by arbitration under the Rules of Conciliation and
> Arbitration of the International Chamber of Commerce in accordance with
> the said Rules.   Each side will appoint one arbitrator, and the two
> arbitrators so appointed will appoint the third arbitrator.   If the two
> arbitrators fail to appoint the third arbitrator within 30 days of their
> appointment, upon the written request by any Party, the Chairman of the
> Court of Arbitration of the International Chamber of Commerce will
> appoint such third arbitrator.   The place of arbitration shall be New York,
> New York, United States of America.   The arbitrators shall apply the law
> of Venezuela to any such controversy or claim.   The language of the
> arbitration shall be English.   Any decision or award of the arbitral tribunal
> (which shall be in writing and contain an explanation as to how it arrived
> at its decision and award) shall be final and binding on the parties to the
> arbitration proceeding.[15]

### B.    THE ARBITRATION AGREEMENT IN THE PETROZUATA GUARANTY PROVIDES FOR ICC ARBITRATION

25.    Section 4 of the Petrozuata Guaranty is materially identical to Section 13.16 of the
Petrozuata Association Agreement and provides:

> All disputes arising in connection with this Guaranty, or the breach,
> termination, interpretation, enforceability or validity thereof, shall be
> finally settled by binding arbitration in New York, New York, USA, under
> the Rules of Conciliation and Arbitration of the International Chamber of

---

[15]    **Exhibit C-1**, Petrozuata Association Agreement § 13.16, at 65.

Commerce by three (3) arbitrators appointed in accordance with said Rules. This agreement to arbitrate and any resulting award shall be enforceable in any court with competent jurisdiction.[16]

26. Article 9 of the ICC Rules permits claims arising out of or in connection with more than one contract to be brought in a single arbitration. Article 9 refers to Articles 6(3)-6(7) and 23(4), which in pertinent part refer in turn to a *prima facie* showing of compatibility between the applicable arbitration agreements and express or implied agreement by the parties that the claims can be determined together in a single arbitration.

27. The requirements of Article 9 are satisfied here. Both the Petrozuata Association Agreement and the Petrozuata Guaranty contain arbitration agreements that provide for a three-member Arbitral Tribunal.[17] Both provide for ICC Arbitration to be seated in New York. And both extend to "all disputes arising in connection with" the underlying agreement.

28. The appointment mechanisms set out in both agreements are mutually compatible. To summarize, under the relevant provisions of the arbitration agreements and Article 12 of the ICC Rules, the procedure for appointing the Arbitral Tribunal is as follows:

(a) As set out in paragraph 33 below, with this Request the Claimant nominates Dr. Poncet as arbitrator.

(b) Within 30 days of the Respondents' receipt of this Request from the Secretariat of the ICC International Court of Arbitration (the ***ICC Court***), the Respondents are required to submit an Answer including their joint nomination of an arbitrator.

(c) Within 30 days from confirmation of the parties' nominations by the Secretariat of the ICC Court, the two arbitrators so appointed should then endeavor to appoint the third arbitrator to serve as president of the Arbitral Tribunal.

---

[16]  **Exhibit C-2**, Petrozuata Guaranty (Petrozuata Association Agreement, Exhibit P) § 4.

[17]  **Exhibit C-1**, Petrozuata Association Agreement § 13.16, at 65; **Exhibit C-2**, Petrozuata Guaranty (Petrozuata Association Agreement, Exhibit P) § 4.

(d)     If the two arbitrators fail to appoint the presiding arbitrator within 30 days of their confirmation, any party may request in writing that the ICC Court appoint such third arbitrator.

29.     The compatibility of the two arbitration clauses and the cognate relationship between the Petrozuata Association Agreement and the Petrozuata Guaranty indicate a common understanding that related claims arising under both should be decided together in a single arbitration.

## IV.     GOVERNING LAW, PLACE, AND LANGUAGE OF THE ARBITRATION

30.     The Petrozuata Association Agreement and the Petrozuata Guaranty both provide that they are governed by the laws of Venezuela, with the Petrozuata Guaranty also including "generally accepted principles of international law to the extent that such principles do not contradict such laws."[18]

31.     The Petrozuata Association Agreement and the Petrozuata Guaranty both provide that New York is the place of arbitration.[19]

32.     The language of these proceedings should be English.   The Petrozuata Association Agreement expressly provides that the arbitration shall be conducted in English.[20] Although the Petrozuata Guaranty is silent as to the language of the arbitration, there is no good reason to treat the Petrozuata Guaranty differently.

## V.     CONSTITUTION OF THE TRIBUNAL

33.     In accordance with the arbitration agreements and Article 12(6) of the ICC Rules, the Claimant nominates Dr. Charles Poncet as arbitrator.  Dr. Poncet's contact details are:

---

[18]   **Exhibit C-1**, Petrozuata Association Agreement § 13.15, at 64; **Exhibit C-2**, Petrozuata Guaranty (Petrozuata Association Agreement, Exhibit P) § 4.

[19]   **Exhibit C-1**, Petrozuata Association Agreement § 13.16, at 65; **Exhibit C-2**, Petrozuata Guaranty (Petrozuata Association Agreement, Exhibit P) § 4.

[20]   **Exhibit C-1**, Petrozuata Association Agreement § 13.16, at 65.

Dr. Charles Poncet M.C.L.
CMS von Erlach Poncet Ltd.
Rue Bovy-Lysberg 2
P.O. Box 5824
1211 Geneva 11, Switzerland

Tel:   +41 22 311 00 10
Fax:   +41 22 311 00 20
Email:  charles.poncet@cms-vep.com

To the best of the Claimant's knowledge, Dr. Poncet is impartial and independent of the parties to this arbitration.

## VI.    REQUEST TO CONSOLIDATE

34.    Article 10 of the ICC Rules provides that the ICC Court may consolidate two or more ICC arbitrations into a single arbitration "at the request of a party."

35.    The Claimant respectfully requests that the ICC Court consolidate this arbitration with a second ICC arbitration launched simultaneously today by Phillips Petroleum Company Venezuela Limited (**CPH,** another wholly-owned subsidiary of ConocoPhillips) against PDVSA and another one of its subsidiaries, Corpoguanipa, S.A.   The claims by CPH arise out of an Association Agreement for another ConocoPhillips investment in Venezuela, the Hamaca Project (the **Hamaca Association Agreement**) and its accompanying guaranty (the **Hamaca Guarantee**), and are substantially similar to claims advanced by the Claimant in the present arbitration.   Both the Petrozuata and Hamaca Projects were expropriated simultaneously at the conclusion of the same interconnected "steps" set out by President Chávez.

36.    The Petrozuata and Hamaca ICC proceedings also feature substantially similar requests for relief and the same Claimant-appointed arbitrator, Dr. Poncet.   Moreover, both of the ICC proceedings arise out of arbitration clauses that, though varying in their level of detail, would be mutually compatible in a consolidated arbitration.

## VII.   NATURE AND CIRCUMSTANCES OF THE DISPUTE

### A.   VENEZUELA MADE COMMITMENTS TO INDUCE FOREIGN INVESTMENT IN VENEZUELA

37.   The Orinoco Oil Belt – a region north of the Orinoco River in eastern Venezuela – contains vast amounts of extra-heavy crude oil.  In the early 1990s, Venezuela sought to increase its crude oil production to more than four million barrels per day.  The *Apertura Petrolera* was announced to achieve that goal through a policy of, among other measures, incentivizing private investment in the oil industry and developing Venezuela's extra-heavy crude oil resources.

38.   Venezuela placed particular importance on the need for foreign investment in connection with the development of extra-heavy crude oil projects in the Orinoco Oil Belt because: (*a*) the Orinoco Oil Belt has some of the largest oil reserves in the world; (*b*) extra-heavy crude oil is technically difficult to extract and commercialize; and (*c*) the commercialization of extra-heavy crude oil requires advanced technology and significant investments, including the construction of upgraders designed to convert this tar-like substance into a new, synthetic upgraded crude oil product (*syncrude*) and, in some cases, the modification of downstream refineries to refine syncrude into saleable end products.

39.   The Venezuelan Congress formed a Bicameral Commission[21] to define the structure and fiscal incentives for all foreign investment in the Orinoco Oil Belt.  In 1993, the Bicameral Commission issued a report outlining the structure that it had determined would be needed to attract foreign investment to the Orinoco Oil Belt (the *Petrozuata Bicameral Report*).[22]

---

[21]   The full title of the Bicameral Commission was the "Bicameral Commission for the Study of the Strategic Associations of PDVSA concerning the Projects Maraven-Conoco and Maraven-Total-Itochu-Marubeni for the Exploitation and Upgrading of Extra-Heavy Petroleum of the Orinoco Oil Belt" (the *Bicameral Commission*).

[22]   **Exhibit C-3** Report Approved by the Bicameral Commission for the Study of the Strategic Associations of PDVSA concerning the Projects Maraven-Conoco and Maraven-Total-Itochu-Marubeni for the Exploitation and Upgrading of Extra-Heavy Petroleum of the Orinoco Oil Belt, 12 August 1993.

40.    The Petrozuata Bicameral Report set forth three fundamental legal elements necessary to induce foreign private investment for the development of the Orinoco Oil Belt and the associated financing:  (*a*) lower taxes, and in particular exempting the Orinoco Oil Belt associations from the 67.7 percent income tax rate then applicable to PDVSA and instead applying the much lower corporate income tax rate; (*b*) lower royalty rates for the first several years of the associations' operations; and (*c*) foreign majority ownership of the associations.[23]

41.    Over the next years, the Venezuelan Congress implemented the recommendations of the Bicameral Commission, including revisions to the income tax law to assure foreign investors that the associations in the Orinoco Oil Belt would be subject to only the 34 percent corporate income tax regime applicable generally to any other industry and commercial activity in Venezuela.[24]  That decision was implemented by both legislation and executive decree-law.[25]

42.    Beginning in October 1994, PDVSA, as the State company in the Petrozuata Association, negotiated an agreement with the Venezuelan Ministry of Energy and Mines concerning the royalties applicable to the extra-heavy crude oil projects, including the Petrozuata Project.  This agreement (the ***Royalty Agreement***) provided that each association would pay the Government a reduced royalty of one percent from commencement of commercial production until the earlier of:  (*a*) nine years from such commencement or (*b*) the time when the project had accrued sales income in excess of three times the total investment made in development of the project.  Upon expiration of the one percent

---

[23]   *Id.*, §§ II(f), VII, VIII.

[24]   **Exhibit C-5**, *Decree-Law No. 3,113, Issuing the Law Partially Amending the Income Tax Law,* OFFICIAL GAZETTE No. 4,628, published 9 September 1993 ("The companies that are constituted under association agreements . . . shall be taxed under the ordinary regimen established in this Law for the anonymous corporations and the taxpayers."); *see also* **Exhibit C-7**, *Decree-Law No. 188, Decree-Law Reforming the Income Tax Law,* OFFICIAL GAZETTE No. 4,727, published 27 May 1994 (setting the applicable income tax rate at 34%).

[25]   *See* **Exhibit C-5**, *Decree-Law No. 3,113, Issuing the Law Partially Amending the Income Tax Law,* OFFICIAL GAZETTE No. 4,628, published 9 September 1993; *see also* **Exhibit C-7**, *Decree-Law No. 188, Decree-Law Reforming the Income Tax Law,* OFFICIAL GAZETTE No. 4,727, published 27 May 1994; **Exhibit C-4**, *Law Authorizing the President of the Republic to Adopt Extraordinary Measures in Economic and Financial Matters*, OFFICIAL GAZETTE No. 35,280, published 23 August 1993 at art. 3.

royalty period, royalties were to be paid at the rate of 16⅔ percent.[26]   Based on the recommendations of the Bicameral Commission, on 10 August 1993, the Venezuelan Congress approved the Petrozuata Project involving ConocoPhillips and PDVSA Petróleo.[27]   Thereafter, ConocoPhillips and the Respondents negotiated the terms of the agreements at issue in this case.

**B.   IN RELIANCE ON VENEZUELA'S COMMITMENTS, THE CLAIMANT INVESTED IN THE PETROZUATA PROJECT**

43.   On 31 May 1995, with the approval and authorization of the Venezuelan government, ConocoPhillips and PDVSA Petróleo signed an Agreement in Principle confirming their accord on the terms of the contract that would govern their joint venture.[28]   Thereafter, on 10 November 1995, the Claimant and PDVSA Petróleo entered into the Petrozuata Association Agreement.[29]

44.   The Petrozuata Association Agreement established the corporate structure for the Project. The Project was structured through an incorporated joint venture, Petrozuata C.A., formed by CPZ and PDVSA Petróleo.   CPZ owned 50.1 percent of Petrozuata C.A. in the form of "Class B Shares," and PDVSA Petróleo owned the remaining 49.9 percent in the form of "Class A Privileged Shares."   Each shareholder appointed two directors to the Board of Directors, PDVSA Petróleo appointed the President of Petrozuata C.A., while the General Manager was appointed by CPZ.[30]

---

[26]   The Ministry of Energy and Mines first agreed in principle to the one percent rate in a letter to PDVSA Petróleo, dated 3 October 1994 in relation to the Petrozuata Project (**Exhibit C-8**), which was forwarded to Conoco several days later.   (The name of the Ministry of Energy and Mines was changed in 2005 to the Ministry of Energy and Petroleum and again, in 2007, to the People's Ministry of Energy and Petroleum.   For ease of reference, all references in this Request are to the "Ministry.")   Currently, its name is the People's Ministry of Petroleum and Mining.   The Ministry and PDVSA Petróleo (at the time, PDVSA Petróleo y Gas, S.A.) entered into the Royalty Agreement on 29 May 1998 (**Exhibit C-10**).   The Claimant then entered into an adhesion agreement to the Royalty Agreement for the Petrozuata Project on 8 October 1998, (**Exhibit C-11**).

[27]   **Exhibit C-6**, *Authorization of Association Agreement between the Companies Maraven, S.A. and Conoco Inc.*, OFFICIAL GAZETTE No. 35,293, published 9 September 1993.

[28]   **Exhibit C-9**, Agreement in Principle between Maraven, S.A. and Conoco Inc., 31 May 1995.

[29]   **Exhibit C-1**, Petrozuata Association Agreement.

[30]   *Id.*§§ 3.02, 6.08, 7.02, 7.03, at 17, 34, 39-40.

45.     On the same date as the signature of the Petrozuata Association Agreement, PDVSA executed the Petrozuata Guaranty (Exhibit P to the Petrozuata Association Agreement) in favor of CPZ.[31]  The Petrozuata Guaranty promised observance and performance of all of the obligations assumed by PDVSA Petróleo in the Petrozuata Association Agreement. By executing the Petrozuata Guaranty, PDVSA acknowledged that it was "fully aware of the contents" of the Petrozuata Association Agreement and "acknowledge[d] the terms and conditions" thereof.[32]

46.     Ultimately, the objective of the Petrozuata Project was to produce, transport and upgrade extra-heavy crude oil, and to market and sell the resulting syncrude as well as other by-products.  Under a separate Offtake Agreement between ConocoPhillips and Petrozuata C.A., the majority of the syncrude produced and upgraded by the Petrozuata Project would be refined at ConocoPhillips's Lake Charles Refinery in Louisiana.  Billions of dollars were invested into the venture in Venezuela, including construction of upgrader facilities and pipeline infrastructure beginning in 1997.  In 1998, ConocoPhillips invested an additional several hundred million dollars to modify its Lake Charles Refinery to enable it to process the Petrozuata syncrude.

47.     As a result of the Claimant's significant financial and technical contributions, the Petrozuata Project was highly successful.  The project dispatched its first shipment of crude in October 1998.  Full syncrude production and its first commercial sales took place on 12 April 2001, thereby triggering the initiation of the 35-year production life of the Petrozuata Association Agreement (and commencing the nine-year period during which the one percent royalty rate would apply under the Royalty Agreement).[33]

---

[31]   **Exhibit C-2,** Petrozuata Guaranty (Petrozuata Association Agreement, Exhibit P).

[32]   *Id.*

[33]   *See* **Exhibit C-1**, Petrozuata Association Agreement § 12.01(a), at 57; **Exhibit C-10**, Royalty Agreement of the Strategic Associations of the Orinoco Oil Belt between the Ministry of Energy and Mines and PDVSA Petróleo (at the time, PDVSA Petróleo y Gas, S.A.), 29 May 1998, at cl. 5.

**C.** **THE RESPONDENTS HAVE WARRANTED INDEMNIFICATION IN THE EVENT OF DISCRIMINATORY ACTIONS UNDERTAKEN BY VENEZUELA**

48.     Pursuant to the express terms of the Petrozuata Association Agreement, PDVSA Petróleo agreed to indemnify the Claimant for economic damage suffered by virtue of Discriminatory Actions taken by Venezuela.  Section 9.07 provides:

> In the event that a Class B Shareholder [*i.e.*, CPZ] suffers in any fiscal year Significant Economic Damage as a result of any Discriminatory Actions ("Injured Shareholder"), such Injured Shareholder shall be compensated by the Class A Privileged Shareholder [*i.e.*, PDVSA Petróleo] for the economic damage suffered by virtue of the Discriminatory Actions . . . .[34]

49.     The Petrozuata Association Agreement defines Discriminatory Actions as follows:

> '<u>Discriminatory Actions</u>' means any actions, decisions, or changes in law, adopted by national, state, or municipal, administrative, or legislative authorities, after a Development Decision has been made, which singly or in combination, result in unjust discriminatory treatment to [Petrozuata C.A.], any of its Shareholders (in their capacity as Shareholders), the associations created under Article 5 of the Organic Law or any of them, or any of their Shareholders (in their capacity as Shareholders), which are not applicable to all enterprises in Venezuela and which produce Significant Economic Damage to the Shareholders of [Petrozuata C.A.] other than [PDVSA Petróleo]; provided that:
>
> (a)     treatment shall not be considered discriminatory if it equally applies to the enterprises (*empresas*) within the oil industry in Venezuela, except that:
>
> > (1)     with respect to the application of income taxes and any valuations as a basis for income taxes (e.g. the Fiscal Export Value), treatment shall be considered discriminatory if it is not generally applicable to most enterprises in Venezuela;
> >
> > (2)     with respect to limitations on:
> >
> > > (i)     the ability to declare or repatriate dividends outside Venezuela;
> > >
> > > (ii)    the right to hold abroad the proceeds of the sale of Upgraded Crude Oil in non-Venezuelan currency; and

---

[34]     **Exhibit C-1**, Petrozuata Association Agreement § 9.07, at 47.

(iii)    the unencumbered convertibility of non-Venezuelan currency into Venezuelan currency (and vice versa) at a free, universal market rate;

treatment shall be considered discriminatory if it is not generally applicable to most enterprises in Venezuela;

(3)    even if treatment equally applies to the enterprises within the oil industry in Venezuela, treatment may nevertheless be discriminatory if after analyzing globally all actions, decisions, or, changes in law that have been adopted in parallel or within a reasonable period of time, such actions, decisions, or changes in law resulted in economic damage to the shareholders of [Petrozuata C.A.], that was not actually suffered by government owned companies within the oil industry, or, if suffered by government owned companies within the oil industry, the negative impact on [Petrozuata C.A.] is disproportionately onerous as compared to the government owned companies within the oil industry, it being understood, however, that if special favorable treatment applicable only to the government owned companies is adopted, such treatment shall not be considered per se discriminatory.

(b)    with respect to municipal taxes, if applicable to any of [Petrozuata C.A.'s] activities, treatment shall be considered discriminatory if the tariff rate applicable is higher than the highest tariff rate applicable to the industrial activity classification(s), as agreed by the Parties and attached hereto as Exhibit "Q," which have enterprises in actual operation in the corresponding municipality; and

(c)    treatment adopted for the purpose of implementing technical or operational regulations relating to safety or the protection of the environment shall not be considered discriminatory:

For the purpose of this definition, treatment shall be considered unjust if it results in Significant Economic Damage (as defined below) and such Damage is subject to compensation under the terms of Section 9.07 of this Agreement.[35]

50.    The Petrozuata Association Agreement defines Significant Economic Damage as:

economic damage arising as a result of Discriminatory Actions during any fiscal year, which amounts to at least US $6.5 million (inflated from 1994 Dollars to the then current time by the US Inflation Index) for all Class B

---

[35]    *Id.* at 9–10.

> Shareholders [*i.e.*, CPZ].  Such economic damage shall be determined by calculating any loan repayments or dividends that [CPZ] would have otherwise received and could otherwise have repatriated in a given fiscal year had no Discriminatory Actions occurred and subtracting therefrom the dividends, Advances thereon and loan repayments, that were actually received and repatriated in that fiscal year by [CPZ].[36]

51.     If a Discriminatory Action causes the Claimant to suffer Significant Economic Damage, then Section 9.07 requires PDVSA Petróleo to indemnify the Claimant.  Section 9.07 also sets out a formula to determine the amount of compensation, as well as applicable procedures for doing so.[37]

52.     Under the Petrozuata Guaranty, PDVSA unconditionally guaranteed PDVSA Petróleo's performance of its obligations under the Petrozuata Association Agreement.[38]

**D.      THE ACTIONS AGAINST THE CLAIMANT**

53.     On 6 December 1998, Hugo Chávez was elected President of Venezuela.   Shortly thereafter, he obtained approval by referendum for a new Venezuelan Constitution and secured the authority to legislate by decree in certain areas.   Invoking his unilateral authority, on 13 November 2001, President Chávez issued a new Organic Hydrocarbons Law (the ***Hydrocarbons Law***).  The Law prohibited private companies from participating in the exploration, production, initial transportation, storage, and sale of natural hydrocarbons, unless they did so through minority participation in *empresas mixtas* (mixed companies) in which PDVSA owned more than a 50 percent interest.

54.     At the time the Hydrocarbons Law came into force, existing investors such as the Claimant received repeated assurances from Venezuela that the Hydrocarbons Law would not be applied retroactively and that it would not affect existing agreements,

---

[36]   *Id.* at 14.

[37]   *Id.* §§ 9.07(a)–(c), at 47-48.

[38]   *See* **Exhibit C-2**, Petrozuata Guaranty (Petrozuata Association Agreement, Exhibit P).

including the Petrozuata Association Agreement.[39]  Such assurances were also consistent with Venezuelan law, including the well-known constitutional principle of non-retroactivity.

55.   However, between October 2004 and June 2007, the Venezuelan government proceeded to dismantle the legal regime that had induced the Claimant and other foreign investors to invest in Venezuela's hydrocarbons sector.  Through the deliberate "steps" to "bur[y]" the *Apertura Petrolera* outlined in President Chávez's speech,[40] Venezuela devalued and then seized the Claimant's interest in the Petrozuata Project for its shared benefit with the Respondents.  For their direct role in these expropriatory acts, the Respondents are liable for the full amount of damages suffered by the Claimant.  In addition, there are further distinct but related Discriminatory Actions for which the Claimant is entitled to compensation under the Petrozuata Association Agreement and Petrozuata Guaranty.

### 1.   Venezuela Eviscerated the Royalty Regime Guaranteed to the Claimant and upon which the Claimant Relied in Investing in the Petrozuata Project

56.   As stated above, prior to making its investment, the Claimant had been promised a one percent royalty rate for nine years, with a maximum rate of 16⅔ percent thereafter.  Both promises were violated.  *First*, on 10 October 2004, Venezuela announced the Royalty Agreement Abrogation, through which it replaced the one percent royalty rate with a 16⅔ percent royalty rate.  *Second*, on 24 May 2006, it introduced the Extraction Tax, which further increased the applicable royalty rate from 16⅔ percent to 33⅓ percent.

### 2.   Venezuela Significantly Increased the Tax Rate for Extra-Heavy Crude Oil Projects, Including the Petrozuata Project

57.   On 29 August 2006, the National Assembly approved a change in the income tax law that increased the tax rate for extra-heavy crude oil projects, including the Petrozuata Project,

---

[39]   *See, e.g.*, **Exhibit C-12**, *President-Elect Hugo Chávez Interviewed Following His Victory*, BBC SUMMARY OF WORLD BROADCASTS, 8 December 1998, at 2; **Exhibit C-13**, *Venezuela:  Foreign Oil Companies Worried by Chávez's "Historic" Oil Law Plans*, BBC WORLDWIDE MONITORING, 5 September 2001.

[40]   *See* **Exhibit C-28**, Transcript of Aló Presidente N° 288:  Desde la Faja Petrolífera del Orinoco, Hugo Chávez Frías, President of the Bolivarian Republic of Venezuela, 29 July 2007, at 7-11 (transcript available from Servicio TvPrensa).

from 34 to 50 percent, effective 1 January 2007.[41]   The standard corporate tax rate remained at 34%.   The Income Tax Increase substantially reduced the value of the Claimant's interest in the Petrozuata Project.

### 3.   Venezuela Completed Its Expropriation of the Claimant's Investment in the Petrozuata Project

58.    Having substantially reduced the value of the Claimant's interest in the Petrozuata Project, Venezuela, in August 2006, revealed its further plan to:  (*a*) strip the Petrozuata Project (and all associated entities) of all rights with respect to the exploration, production, upgrading, and commercialization of extra-heavy crude oil and (*b*) replace that project with an *empresa mixta*, majority owned and controlled by PDVSA, that would be granted all of the rights taken away from the Petrozuata Project.[42]

59.    This plan was formalized on 26 February 2007, when President Chávez announced on his weekly television and radio broadcast that he was issuing the Nationalization Decree, which would require the repatriation of the Petrozuata Project, among others.[43]   The Nationalization Decree specified that all extra-heavy crude oil projects in the Orinoco Oil Belt, as well as all projects operating under exploration at risk and profit sharing agreements were to be expropriated through migration to *empresas mixtas*.[44]   The Nationalization Decree further provided that PDVSA would own at least 60 percent of the shares in the new companies and did not provide for compensation.   The Nationalization Decree allowed the affected foreign investors merely four months to agree to terms for the expropriation.

---

[41]    **Exhibit C-19**, *Law Partially Reforming the Income Tax Law*, OFFICIAL GAZETTE No. 38,529, published 25 September 2006; *see also* **Exhibit C-14**, *Venezuela Will Raise the Income Tax in the Orinoco Belt from 34 to 50%: The Companies Affected Are ExxonMobil, Statoil, ConocoPhillips, Chevron and BP*, REPORTE, 16 June 2005.

[42]    **Exhibit C-18**, Petrozuata Not Binding Terms Sheet for the Migration of the Associations, August 2006.

[43]    **Exhibit C-21**, Aló Presidente Nº 268, 26 February 2007 (available at:  www.alopresidente.gob.ve).

[44]    **Exhibit C-22**, *Decree With Rank, Value and Force of Law of Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Risk and Profit Sharing Exploration Agreements, Decree No. 5,200,* OFFICIAL GAZETTE No. 38,632, published 26 February 2007.

60. On 1 May 2007, with troops standing by, the Respondents seized control of operations of the Petrozuata Project.[45]  The Claimant's operational personnel were no longer admitted on site.

61. Four months to the day after the Nationalization Decree was announced, on 26 June 2007, then Energy Minister Rafael Ramírez – who also served as the President of PDVSA – announced that the oil investments of the Claimant in Venezuela had been expropriated without compensation.[46]

62. The Expropriation of the Claimant's interest in the Petrozuata Project was completed with the formal ratification of the Nationalization Decree by the Venezuelan National Assembly pursuant to the Law on Effects published on 8 October 2007. [47]

## E. THE RESPONDENTS WILLFULLY BREACHED THEIR OBLIGATIONS UNDER THE PETROZUATA ASSOCIATION AGREEMENT, THE PETROZUATA GUARANTY, AND VENEZUELAN LAW

63. The Respondents played an instrumental role in stripping the Claimant of its rights under the Petrozuata Association Agreement.  There was direct coordination between the Ministry and the Respondents in conceiving and carrying out the fiscal measures and ultimate expropriation, with Minister Ramírez serving in the dual role as head of the Ministry and President of PDVSA.  President Chávez in his speech recounting the "steps" taken to dismantle the *Apertura Petrolera* specifically commended Minister Ramírez, saying "[w]e have a great friend heading up PDVSA[.]"[48]

---

[45] *See also* **Exhibit C-25**, Photographic evidence of the role played by the Respondents, taken 1 May 2007.

[46] *See, e.g.*, **Exhibit C-26**, PDVSA Press Release, PDVSA controls 78% of shares in Orinoco Oil Belt businesses, 26 June 2007.

[47] **Exhibit C-29**, *Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements*, OFFICIAL GAZETTE No. 38,785, published 8 October 2007.

[48] **Exhibit C-28**, Transcript of Aló Presidente Nº 288: Desde la Faja Petrolífera del Orinoco, Hugo Chávez Frías, President of the Bolivarian Republic of Venezuela, 29 July 2007, at 10 (transcript available from Servicio TvPrensa).

64.     PDVSA also played a critical role in consummating the expropriation by entering into a Memorandum of Understanding dated 26 June 2007 with certain companies involved in the Orinoco Oil Belt (the **MOU**).  The MOU provided for the migration of investments held by all  foreign investors to *empresas mixtas*[49] and, as Minister Ramírez explained in a public address, enabled PDVSA to double its average participation in and ownership of Orinoco Oil Belt projects – precisely at the Claimant's and other foreign investors' expense.[50]

65.     The Respondents' conduct is irreconcilable with their contractual promises to the Claimant, and constitutes a willful breach of the obligations and duty of good faith and fair dealing owed to the Claimant, both under the Petrozuata Association Agreement and the Petrozuata Guaranty pursuant to Article 1.160 of the Venezuelan Civil Code[51] (or, alternatively, *hecho ilícito* (tortious interference) under Venezuelan law).   The Respondents are required to provide the Claimant recompense of all damages suffered, and the nature of their conduct disentitles them from relying on any contractual provision that could have the effect of limiting liability for their willful actions.

**F.      PDVSA Petróleo Must Partially Indemnify the Claimant for the Discriminatory Actions in Accordance with the Petrozuata Association Agreement**

66.     At a minimum and separately from the claims arising from the breach of contract (or, alternatively, *hecho ilícito* (tortious interference)), PDVSA Petróleo is obligated under the Petrozuata Association Agreement – as a result of Venezuela's Discriminatory Actions – to pay partial indemnification in accordance with the Petrozuata Association Agreement's compensation formula.  In effect, PDVSA Petróleo is required to act as a limited insurer of the Claimant's damages from Discriminatory Actions.

---

[49]     **Exhibit C-27**, Transcript of Speech by Rafael Ramírez, Signing of the Memoranda of Understanding of the Succession Agreements for Mixed Companies, 26 June 2007.

[50]     *Id.*

[51]     Civil Code of Venezuela at art. 1.160.

### 1.    The Income Tax Increase Resulted in Unjust Discriminatory Treatment Against the Claimant

67.    The August 2006 Income Tax Increase, effective 1 January 2007, constituted Discriminatory Action under the Petrozuata Association Agreement because it was an unjust "action[], decision[], or change[] in law" by the Venezuelan government that caused Significant Economic Damage to the Claimant.[52]   The Income Tax Increase raised the tax rate on the Petrozuata Project to 50 percent, substantially in excess of the general corporate tax rate of 34 percent.[53]   This disparity enlivens the protections contained in paragraph (a)(1) of the definition of "Discriminatory Action" found in Article 1 of the Petrozuata Association Agreement:

> [W]ith respect to the application of income taxes . . . treatment shall be considered discriminatory if it is not generally applicable to most enterprises in Venezuela.[54]

68.    Because the 50 percent income tax rate was not generally applicable to most enterprises in Venezuela, it constituted a Discriminatory Action under the Petrozuata Association Agreement.

69.    PDVSA Petróleo is thus obligated to partially indemnify the Claimant for each fiscal year that the Claimant suffered Significant Economic Damage as a result of the Income Tax Increase.[55]

### 2.    The Expropriation Resulted in Unjust Discriminatory Treatment Against the Claimant

70.    The Expropriation viewed globally, is a Discriminatory Action under the Petrozuata Association Agreement.   The measures that led to the confiscation of the Petrozuata Project were paradigmatic acts of discrimination.   Although it was not known at the time, the Royalty Agreement Abrogation and Extraction Tax were – as President Chávez made

---

[52]   **Exhibit C-1**, Petrozuata Association Agreement at art. I, at 9-10; *see also* ¶¶49-50 above.

[53]   *See supra* ¶57.

[54]   **Exhibit C-1**, Petrozuata Association Agreement at art. I, at 9; *see also supra* ¶49.

[55]   *See* **Exhibit C-1**, Petrozuata Association Agreement § 9.07; *see also supra* ¶48.

clear in his July 2007 speech – the first and third "steps" in his administration's initiative to expropriate foreign oil investments induced through the *Apertura Petrolera*, including CPZ's investment in the Petrozuata Project.[56]   Each step constituted an "action[], decision[], or change[] in law" adopted by the Venezuelan government that caused "Significant Economic Damage" to the Claimant.[57]   The confiscatory measures alone, and when viewed together with the earlier evisceration of the royalty regime and Income Tax Increase, give rise to liability for PDVSA Petróleo pursuant to paragraph (a)(3) of the definition of "Discriminatory Action" which provides that:

> [E]ven if treatment equally applies to the enterprises within the oil industry in Venezuela, treatment may nevertheless be discriminatory if, after analyzing globally all actions, decisions, or changes in law that have been adopted in parallel or within a reasonable period of time, such actions, decisions, or changes in law resulted in economic damage to shareholders of [Petrozuata C.A.], that was not actually suffered by government owned companies within the oil industry, or, if suffered by government owned companies within the oil industry, the negative impact on [Petrozuata C.A.] is disproportionately onerous as compared to government companies within the oil industry . . . .[58]

71.   The Respondents were the beneficiaries of the Expropriation.  At President Chávez's July 2007 speech, held at a Petrozuata site, Minister Ramírez also "welcome[d] everyone here to this oil area, now nationalized, 100% interest held by the Venezuelan state, through PDVSA" and to express "thanks for [President Chávez's] support and solidarity in this battle that we are waging, [his] reinforcement of our commitment and that of the New PDVSA."[59]

---

[56]   **Exhibit C-28**, Transcript of Aló Presidente Nº 288: Desde la Faja Petrolífera del Orinoco, Hugo Chávez Frías, President of the Bolivarian Republic of Venezuela, 29 July 2007, at 3, 6, 7 (transcript available from Servicio TvPrensa).

[57]   **Exhibit C-1**, Petrozuata Association Agreement at art. I, at 9-10; *see also supra* ¶¶49-50.

[58]   **Exhibit C-1**, Petrozuata Association Agreement at art. I, at 9–10; *see also supra* ¶49.

[59]   *See* **Exhibit C-28**, Transcript of Aló Presidente Nº 288:  Desde la Faja Petrolífera del Orinoco, Hugo Chávez Frías, President of the Bolivarian Republic of Venezuela, 29 July 2007, at 14 (transcript available from Servicio TvPrensa).

72.    PDVSA Petróleo is thus obligated to partially indemnify the Claimant for each fiscal year that the Claimant suffered Significant Economic Damage as a result of the Expropriation.[60]

## G.    PDVSA MUST PARTIALLY INDEMNIFY THE CLAIMANT FOR THE DISCRIMINATORY ACTIONS IN ACCORDANCE WITH THE PETROZUATA GUARANTY

73.    As guarantor for PDVSA Petróleo, PDVSA has the obligation to ensure payment of compensation for each of the Discriminatory Actions set forth above:

> PDVSA hereby guarantees to [CPZ] (a) the full and proper observance and performance by [PDVSA Petróleo] of the terms, covenants and conditions in the [Petrozuata Association Agreement] and the Agreements which are to be observed or performed by it; (b) that upon any breach by [PDVSA Petróleo] of any of the terms, covenants and conditions of said [Petrozuata Association Agreement] or the Agreements, PDVSA will perform, or cause to be performed, each and every one of said terms, covenants and conditions; and (c) to pay upon demand to [CPZ] (or to PETROZUATA if [CPZ], at its sole option, decides that the payee should be PETROZUATA) the amount of any loss or damage which [CPZ] or PETROZUATA may suffer by reason of [PDVSA Petróleo's] nonperformance or non-observance, in whole or in part, of all or any of said terms, covenants and conditions as provided by said [Petrozuata Association Agreement] or Agreements.[61]

74.    In the absence of immediate and complete payment by PDVSA Petróleo, PDVSA is obligated to partially indemnify the Claimant for each fiscal year that the Claimant suffered Significant Economic Damage as a result of the Discriminatory Actions.

## H.    IN RESPONSE TO THE DISCRIMINATORY ACTIONS, CONOCOPHILLIPS REPEATEDLY COMMUNICATED ITS COMPLAINTS

75.    In response to the Discriminatory Actions, ConocoPhillips repeatedly communicated its complaints to PDVSA Petróleo. In a letter dated 29 November 2006 sent to Eulogio Del Pino, the Director of PDVSA Petróleo (now President of PDVSA), among others ConocoPhillips, on behalf of the Claimant, protested the Royalty Agreement Abrogation, the Extraction Tax, and the Income Tax Increase, and stated that it "reserve[d] all of its

---

[60]    **Exhibit C-1**, Petrozuata Association Agreement § 9.07, at 47; *see also supra* ¶48.

[61]    **Exhibit C-2**, Petrozuata Guaranty (Petrozuata Association Agreement, Exhibit P), at 3.

rights under Venezuelan and International Law with respect to such changes."[62] Similarly, in a letter dated 6 March 2007 to Mr. Del Pino, the Claimant objected to the Nationalization Decree, observing that "ConocoPhillips Petrozuata BV has not accepted the transfer to one of the state companies" of the Petrozuata Project.[63]   As in its other prior letters, the Claimant generally reserved its rights and furthermore specifically reserved "its rights to complaints and lawsuits under . . . the [Petrozuata] Association Agreement."[64]   In the same way, in a letter dated 12 April 2007 to Minister Ramírez and others, ConocoPhillips, on behalf of the Claimant, again specifically reserved its rights under the Petrozuata Association Agreement, observing that "[n]othing in this letter should be interpreted to prejudice any rights of ConocoPhillips under, inter alia … the Petrozuata [] Association Agreement dated November 10th, 1995, as amended, and all associated or related agreements . . . such rights being fully reserved by ConocoPhillips."[65]   Through communications such as these, ConocoPhillips left the Respondents in no doubt as to its and Claimant's opposition to the Discriminatory Actions.

**I.** **THE CLAIMANT HAS PURSUED THE ONLY OTHER PRACTICABLE REMEDY FOR NEARLY SEVEN YEARS**

76.    The Petrozuata Association Agreement establishes that alternative remedies are to be pursued "to the fullest extent practicable" in order to cure the economic damage suffered as a result of one or more Discriminatory Actions.   The Claimant has pursued the only other practicable remedy, ICSID Arbitration, for nearly seven years.

77.    On 3 September 2013, the ICSID Tribunal rendered its Decision on Jurisdiction and Liability.   The issues determined in that Decision were reconfirmed on 10 March 2014,

---

[62]   **Exhibit C-20**, Letter from A. Roy Lyons, President, ConocoPhillips Latin America, to Dr. Bernard Mommer, Vice Minister of Hydrocarbons, et al., 29 November 2006.

[63]   **Exhibit C-23**, Letter from A. Roy Lyons, President, ConocoPhillips Latin America, to Eulogio Del Pino, 6 March 2007.

[64]   Id.

[65]   **Exhibit C-24**, Letter from A. Roy Lyons, President, ConocoPhillips Latin America, to Minister Rafael Ramírez et al., 12 April 2007.

when the ICSID Tribunal issued its decision denying Venezuela's Request for Reconsideration.  Thus, the ICSID Tribunal confirmed its determinations that:

(a)     Venezuela was guilty of an unlawful expropriation, and that the damages resulting therefrom would be determined in a second quantum phase of the ICSID proceedings, and;

(b)     the claims arising from the Royalty Agreement Abrogation, the Extraction Tax, and the Income Tax Increase were outside the scope of the BIT.[66]  The ICSID Tribunal also determined that it had no jurisdiction over claims advanced under Article 22 of Venezuela's Investment Law.[67]  The ICSID Tribunal, however, did not question the ICSID Claimants' substantive entitlements with regard to those claims through alternative remedies.

78.     In the light of the ICSID decision, and the law applicable thereto, the Claimant now proceeds to commence these proceedings in which it exclusively seeks relief in connection with the Petrozuata Association Agreement and the Petrozuata Guaranty.  In making these claims, the Claimant emphasizes that it does not seek double recovery for the damage it has suffered.  To the extent that the Claimant is awarded damages in the ICSID Arbitration and receives payment of such an award, the Respondents will receive an appropriate offset from their obligations arising from an award in these proceedings, and *vice versa*.

## VIII.   RELIEF REQUESTED

79.     As a consequence of the foregoing, the Claimant respectfully requests that the Arbitral Tribunal render an award:

(a)     Declaring that PDVSA Petróleo willfully breached its contractual obligations and duty of good faith and fair dealing owed to the Claimant under the Petrozuata

---

[66]   **Exhibit C-30.** Decision on Jurisdiction and Liability, ¶¶318–32.

[67]   *Id.*, ¶¶225–63.

Association Agreement, and that PDVSA Petróleo is liable fully to compensate the Claimant accordingly;

(b)     Declaring that PDVSA is liable to indemnify the Claimant for PDVSA Petróleo's breach of its contractual obligations and duty of good faith and fair dealing owed to the Claimant under the Petrozuata Association Agreement, and that PDVSA is liable fully to compensate the Claimant accordingly;

(c)     Declaring that PDVSA willfully breached its contractual obligations and duty of good faith and fair dealing owed to the Claimant under the Petrozuata Guaranty, and that PDVSA is liable fully to compensate the Claimant accordingly;

(d)     Declaring that the Respondents' interference with the Claimant's contractual rights constitutes, alternatively, *hecho ilícito* (tortious interference) under Venezuelan law, and that the Respondents are liable to compensate the Claimant accordingly;

(e)     Declaring that the Income Tax Increase constitutes a Discriminatory Action under the Petrozuata Association Agreement;

(f)     Declaring that the Expropriation constitutes a Discriminatory Action under the Petrozuata Association Agreement;

(g)     Declaring that PDVSA Petróleo is liable to indemnify the Claimant for the Discriminatory Actions under the terms of the Petrozuata Association Agreement in an amount to be quantified;

(h)     Declaring that PDVSA is liable to indemnify the Claimant for the Discriminatory Actions under the terms of the Petrozuata Guaranty in an amount to be quantified;

(i)     Awarding damages in an amount to be quantified;

(j)     Awarding indemnification for Discriminatory Actions in an amount to be quantified;

(k)     Awarding pre-award compound interest, for the full effects of the Discriminatory Actions, at a rate to be fixed by the Tribunal, to run from the latest damages update to the date of the Award;

(l)     Awarding post-award compound interest at a rate to be fixed by the Tribunal, to run from the date of Award until the date of full and final payment;

(m)    Requiring the Respondents to bear the costs of the arbitration as set out in Article 37(1) of the ICC Rules; and

(n)     Granting such additional or other relief as may be just under the law.

80.     The Claimant reserves the right to amend or supplement this Request or to make additional claims or revisions to its claims.  This includes but is not limited to additional claims arising from further losses suffered by the Claimant as a result of the Law on Effects that may arise in the future.

Respectfully submitted,

10 October 2014

Jan Paulsson
Constantine Partasides QC
Luke Sobota

THREE CROWNS

D. Brian King
Elliot Friedman

Freshfields Bruckhaus Deringer US LLP